Mr. Chief Justice TANEY
 

 delivered the opinion of the court.
 

 This case has arisen out- of two acts of Assembly, passed by;the . ■ legislature of Ohio, one in 1837, and the other in 1838, and an order of the Board of Public Works of that state, whereby a toll has been imposed upon passengers travelling in the mail-stage on the Cumberland road.
 

 We have already, at the present term, fully expressed the opinion of this court, in relation to the compacts between the United States and the states of Ohio, Pennsylvania, Maryland, and .Virginia, concerning this road, and the rules by which they ought to be interpreted! It is only necessary, therefore, on this occasipn, to apply the principles there-stated to'the case before uS.
 

 The material parts of the laws in question are the 4th section of the act of 1837, and the 24th section of the act of 1838. The first imposes a toll of three oents on .every passengér in the mail-stage, at each toll-gate; and the secondauthorizes the Board of Public Works to revise and mddify the rates of toll to be paid by persons using the ' road; and in pursuance of this authority the board passed an order raising the toll- on each passenger in -the mail-stage to ten cents. But no toll is charged, either by the law or the order of the board, upon persons travelling in any other carriage.
 

 The 4th section of the act of 1831 / whereby the state of Ohio proposed, with the assent of -Congress, to take charge of the road and keep it in repair, contains a specific enumeration of the tolls she intended to charge, upon carriages of every description, and other properly ; and after making this enumeration, the section concludes with the following proviso: “ That no toll should be received or collected for the passage of any stage .or coaph conveying the United States, mail, or Jhorses bearing the-same, or any wTagon or carriage laden with the property of the United States, or any cavalry or other troops, arms or military stores belonging, to the same or to any of the. states comprising this union, or any person or persons on'duty
 
 *741
 
 in the military service of the United States, 4>r .of the militia of aoy of the states.” -,
 

 We shall hereafter speak of .the 15th .section of-this act, which has been supposed to justify,the toll in question. But, subject to the ■modifications, if any, authorized by thafc-section, the entire Contract in relation to the tolls,, offered by the state and ac cepted by '<£on-gress, is to be found in the 4th; the residue of the act containing nothing more than detailed regulations for the collection and appli- ' cation of the tolls'.
 

 At the time this compact was made, it was well known that thé mail was always transported by contractors, and that whenever it’, was.conveyed in carriages, the vehicles belonged tO them, and wer-e their own private property, and not the property of the United States. It was equally well known that upon this road, as well as many others, the postmaster-general,- in his contracts, uniformly required that the mail should be carried in a stage or coach capable pf accommodating a certain number of passengers, the presence of . the passengers being regarded as adding to-the safety of the mail, , • and superseding the necessity of any other guard.
 

 This mode of transporting the mail ^must have been perfectly ■ known to the state in 1831, when the. agreement was made; and in providing for the exemption of carriages conveying the United States mail, both parties must hav.e.intended to exempt the vehicles usually employed in that service; and' that carriages belonging to the contractors, although carrying passengers, were to pay no toll, while all other vehicles were to be charged at the rate specified in the law. The reason of this exemption is evident; for a toll charged upon the. carriages of the contractor would, in effect, be a charge upon the Post-office 'Department, since the contractor would be obliged to make provision for this expense when bidding for the contract, and regulate his bid so as to cover it..'
 

 In the proposition made by Ohio, nothing was said of a toll on the passengers in a carriage of any kind, but the charge is made upon the carriage itself, according to its description, and the number of horses, without any regard to the number of persons that may be .travelling in it; and it. is évident that it was at that time supposed that the rates specified and agreed 'on would prove sufficient to keep the road'in repair, and.that the United States would always thereafter have the free use.of it, for mail-carriages,of the usual kind,, .without any burden upon them, direct or indirect.
 

 If the expectations of the parties had been realized, and the tolls mentioned in the law had produced revenue enough to preserve the road, no one, we think, would have supposed that tolls could'be collected from passengers in the mail-stage, or that the specified .charges upon the carriages could have been reduced, and the deficiency supplied by a toll upon persons traveUing in the carriages which conveyed the mail.
 

 
 *742
 
 Lx the case of Searight
 
 v.
 
 Stokes and others, we have alrdady. said, that with an agreement like this before us between the United States and a state, we must look 'at the relation in which the parties stood to one another, as’ well as to the subject-matter of the contract,, ■and the object which the high contracting parties intended to attain; and we must expound it upon principles of justice, so as to accomplish the purposes for which it was made, and not defeat their manifest intention, by a narrow and literal interpretation of its words. •And regarding it in this point of view, we think it very clear that no part of -the burden of supporting this road was intended to be levied upon the United .States, but was to be obtained altogether from other sources; and' that the relative position and privileges of the mail-coaches in regard to tolls, as prescribed ih the law, were to be always afterwards maintained, unless a deficiency or superar bundance of revenue should render it necessary to increase or dir minish the rates fixed in the law. For if this were not the case, the whole detailed and particular .provision in relation to the things to be charged, and the rates to be imposed, as set forth in thé law-of Ohio, and so cautiously recited in the act of Congress consenting to the. surrender of the road, would -be nugatory and without an object. On the. other hand, this mode of proceeding was the natural and proper one, where two sovereignties .were contracting with each other by means of legislative action; and it was obviously adopted by the parties in this instance in order to show the terms proffered by Ohio, and assented to by Congress, and forms the con- ■ ditions of the compact between them,
 
 so
 
 far as tkfeir respective rights were concerned.
 

 We proceed to apply these principles to the question before us The law of the state, and the order of its. Board of Public'Works, impose a toll upon every one travelling in -the mail-stage, while the passengers in every other.vehicle are allowed to go free.. If this can be done, it is manifest that the United States will derive no benefit from the compact, and so far from enjoying the privilege for which they stipulated, and for which they paid-so heavily in the construction of the road, a large portion, -of the* burden of repairs will be thrown upon them. This is strikingly illustrated by comparing the toll charged upon coaches similar to those employed in conveying the mails, with the toll indirectly levied upon the mail-stage, by a charge upon its passengers.- According to the rates contained in the law of which we are speaking, a four-wheel carriage, drawn by four horses, pays at each gate thirty-one .and a quarter cents, and if it is not conveying the man, it pays nothing on its passengers. This sum is therefore the whole. amount of the toll to which it -is liable. Now the mails on this road have, we -understand, been always tranáportéd in coaches, of the above 'description, and' although under the order of the Board of Public Works no toll is charged directly upon the carriage, yet every passenger must pay ten cents at each
 
 *743
 
 gate,, so that the carriage of a mail-contractor, containing six passengers, pays nearly double as much as a like carriage owned by any one else with the same number.' And what still more strongly marks the disadvantages to which the-United States are subjected by this order of the board, these passengers may be persons in the service of the United States, passing along the road in the execution of some public duty, for the order makes no exceptions in .their favour. And although, this toll, in form, is laid upon the, passengers and not upon the vehicle, the result is the same; for in either case it is, in effect, a charge upon the proprietor of the carriage, diminishing his profits in that portion of his business; and when thus levelled exclusively at passengers in the mail-stage, it accomplishes indirectly what evidently cannot be done directly by a toll upon thecarriage, and in its consequences must seriously affect the interests of the United States. For in bidding for a contract upon a road so much travelled as this, the bidder would undoubtedly be greatly influenced by thé 'advantages which a contract would-give him in the conveyance of passengers, as his carriages, when carrying the mail, are entitled to go free. But if they, and they alone, are to be subjected to this burdensome and unequal toll, it is obvious that he must seek to reimburse himself, by enlarging his demand upon the government. Indeed, if this system of levying toll can be sustained, the mischief may not stop .here; and'it will be in the power-of any one of the states through which the road passes so to graduate the tolls as to drive all passengers from the mail-stages into other lines, and by that means compel the United States, contrary to their wishes, and contrary to the'public interest, to transport the mails in vehicles in which no passenger would travel.
 

 Nevertheless we do not mean to deny the right of the state to impose a toll upon passengers in the mail-stages, provided, the power is exercised, in a manner and upon principles, consistent with the spirit and meaning of the argument by which the road was transferred to the care of the states. On the contrary, in the case of Searight
 
 v.
 
 Stokes and others, we have already said that such a toll may be lawfully collected. But as no toll on passengers had been proposed by the. law of Pennsylvania, the opinion,' on that occasion,' is expressed in general terms, as to tíre right; the case then under consideration, not calling upon the court to speak more particularly upon the subject. The Ohio law, however, brings the. question directly before us, and makes it necessary to state inore, fully and precisely the opinion of .the court.
 

 The true meaning of the compact we understand to be this. The carriages carrying the mail, with their passengers, travelling in the known and customary manner, were to pass toll free, as well as other vehicles laden with the property of the-United States and the persons employed in their service, as mentioned in the proviso hereinbefore recited; and the road was to be kept in repair by.the
 
 *744
 
 •■revenue derived front the tolls specified in the Ohio law, according to the rates, there.set forth, provided they should prove to be sufficient for the. purpose. No toll was at that time proposed upon/ passengers many vehicle,, and passengers in the mail-stage there-" fore ha¿ no• pepuliar privilege in going free,-and merely passed along the road upon-the same terms with fhose who were travelling in Other carriages. Andas the compact contains no stipulation for the exemption of travellers'-in the mail-stages, the general government " can.demand no Nadvaritages in their behalf, which are not extended do .passengers in other vehicles. Rut'they have a right to insist.that the\equality upon this subject, which- the law of Ohio originally proposed, shall still be 'maintained; that the privilege and advantages intended to be secured to the carriages conveying the mail, over those granted to other vehicles, shall be preserved in substance and reality as well as in form; and that the passengers in the mail-stages shall not.be selected and set apart, as the especial objects upon which burdens are to .be laid, and.to which travellers, in other . carriages are not.to'be subjected.
 

 If, therefore, the revenue from the road, according' to the rates originally agreed on, was found to be inadequate, then the state had undoubtedly a right to increase the rate on "any thing before subject to toll; or might, if it was deemed more advisable, leave the tolls as they stood, and charge in addition to them a toll' on passengers. And if instead of selecting the persons travelling in the mail-coaches, áñd laying the burden exclusively upon them, all passengers in vehicles of any .kind had been equally charged, the real and sub- ' stantial advantages and privileges to Which the United States are entitled under the agreement would have'been preserved, and the equality in relation to passengers originally existing betwéen the mail-coaChes and other carriages would not have been disturbed. And it is in this manner-only,, in our judgment, and as a toll in addition to that specifically stated in "the contract, and imposed equally-upon passengers in every description of vehicle, that persons travelling in the mail-stages can be lawfully charged, without first obtaining the assent of Congress.
 

 The 15th section of the law of 1831 has been relied on in the argument, as reserving to the state the right to make any alteration it might afterwards think proper without regard to the interest of the general -government. It is true that this section begins with a declaration that it shall be lawful for the Genéral Assembly at any future session, without the assent of Congress, to change, alter, or amend the act. .But this clause evidently relates -to the various provisions made in the law for tile collection'and disbursement of the money arising from the tolls proposed to be charged. The United States could have no interest in these details, and they were therefore properly retained in the hands of the state. And so in' regard to the privilege of passing free on certain occasions, given by the-
 
 *745
 
 law, it is undoubtedly in the power of the state, if it thinks proper, to revoke it, since the exemption was a mere voluntary act, founded. on no valuable consideration, but growing out of what was then supposed to be a just and liberal policy, which the state could afford to exercise; but which it had the right to change whenever it was deemed necessary to do so. But a full and valuable consideration' had been paid, by the United States for the privileges reserved to them, and they were a part of the contract which transferred the -road to the care of the state. And this being the case, 'the section in question cannot by any sound rule of construction be regarded as inconsistent with the contract contained in-another part of the same law.,, and qs placing the rights secured to one party entirely at the discretion and the control of the other. The reservations of power to the state, evidently relate to subjects in which the general government had no separate interest; and they would have, been altogether unnecessary and useless if the state had not considered the preceding part of the law as the proffer of a com-1 pact which was to be obligatory upon it; if assented to by Congress.
 

 There is a clause in-the law. of 1837, which would appear, to distinguish between the mail-stages, in relation .to toll, where more than one mail passed along the road on the. same day. Upon this point it may be proper to say, that, in the opinion of the court, it Tests altogether in the discretion of the postmaster-general, where the power has been conferred on him by Congress, to determine at what hours the mail shall leave particular places and arrive at others; and to determine whether it shall leave the same place only once a day or more frequently. Upon this point his decision is absolute, when the discretion is committed to him by the laws of the United States, and cannot be controlled by a state or by the courts. And in the ■ case of Searight
 
 v.
 
 Stokes and others, when, the court speak of abuses by the contractors in the number of carriages employed, and of thp right of -the court to enforce the compact, i.t will, be seen by a reference to the opinion,- that it is confined to cases where the mail-bags, directed to leave the post-office at the same time, are unnecessarily divided among a number of carriages in order to evade ■ the payment of toll’; and the opinion expressed on that occasion by ’ the coiirt does not apply to stages leaving the post-office with mails at different hours, in obedience to the orders of the department. In the latter case.it is immaterial whether the mails are light or heavy. .The postmaster-general'is, upon this subject, the proper and only • judge of what the public interest and convenience requires, and his decision cannot be questioned by the courts.
 

 The provision upon this subject, however, appears to have been intended to guard against -abuses by contractors, rather than to interfere with the powers of the postmaster-general. And in regard to the toll imposed, as hereinbefore mentioned, if it is necessary for the support of the road, it is in the power of the parties to the com
 
 *746
 
 pact to modify it at tbeir pleasure, and to give the state the power it has .exercised. But according to the terms of the contract; as it Was originally, made, and. still stands, the toll upon passengers in the mail-stages, laid in the manner hereinbefore stated, cannot law-, fully be demanded, and the judgment of ike state court must therefore be reversed.
 

 Mr. Justice 'DANIEL.
 

 From the decision just pronounced on behalf of the majority of the court, I am constrained to dissent. - Upon the principles involved in the decision, so far as they, have been assumed as the foundation of rights in the federal government, or in the postmaster-general as its agent or representative, independently of any agreement with the state; of Ohio, my opinion has already been declared. That opinion was expressed on a similar point arising in the case of Searight
 
 v.
 
 Stokes et al., during the present term*; it is unnecessary, therefore, on this occasion to repéat it. With respect to- the compact which' is said to have been made between the federal government and the state of Ohio, by the act of Congress relinquishing the control of the. Cumberland road to the state, and 'by the act of the Ohio legislature, ■ assuming the control arid management of that road, it has not to my mind been shown'that this compact has. in any respect been violated by the state. A cursory view of the' legislation, both by the-state and by Congress, will establish the very converse-of any such infer-' ence. That the several proceedings on the part of the state steer entirely clear of collision with the letter of that compact, has not, So far as I have heard, been even disputed. The statute of Ohio, passed on the 4th 'of February, 1831, after several' provisions — 1st, investing the governor of the state with power to take--under his care-that portion of. the Cumberland road comprised within the liinits of the state; 2dly, prescribing .'the rates of .toll to be collected; .3dly, laying down regulations for the police of the road; contains in the second proviso of the 4th section the. following enactment: “ Provided also, that no toll shall be received or collected for the passage of any .stage or coach carrying the United States mail, or horses bearing the same, or any wagon or carriage lad en with the property of the United States, ^or any cavalry or other .'troops, arms or military stores belonging to the same, or to any of the states of the union; or any person- or. persons on duty'in the military service of the United States/&c., &c.” The. 15th section of the same law is in the following words: “ That it shall be lawful for the General Assembly at any future session thereof, without the assent of Congress, to change, alter, or amend this act; provided that the same shall not be so changed, altered, or arriended, as to reduce or increase the fates of toll hereby established, below or above a sum necessary to defray the expenses incident to the preservation and repair of the said road, to the erection of gates and toll-houses
 
 *747
 
 thereon, and for the- payment of the fees or salaries of the superintendent, the collectors of'tolls, and such other agents as may be necessarily employed in' the preservation and repair of the same, according to the true intent and meaning of the act.” The act of •'Congress of the 2d of March, 1831, (4 Story’s L. U. S. p. 2250,) is nothing more than a literal recital of the law •of Ohio-, and an entire and unqualified assent to, and adoption, of, that law. These statutes comprise* all that has been ever done by the state and federal governments, which amounts to any thing in the nature of an agreement or compact between them in reference to the Cumberland. road. Let us now inquire what it is that, by reasonable and proper construction, these'laws import? And it should, in their examination, ever be borne in mind, that whatsoever the law of Ohio, has.ordained in reference tó its subject matter; whatever rights or powers it has claimed for the state in’regard to it, the act of Con- ■ gress-has unconditionally recognised the whole. The second pro- . viso of the 4th sectión, already'quoted,«contains no stipulation'that-ordinary travellers or passengers, or any others-indeed, or any de- ■ scriptions of property, save those expressly enumerated in the proviso., shall pass upon the road free of toll. •' It concedes to the fede- . ral government that stages carrying the mail, i. e. the carriages and .' the ■ horses necessary for' their use, and the mail itself, should not pay toll; but with respect to private travellers, and to everything, within or without those carriages, the law- is entirely silent. By what correct implication, then,'can the power of the state to levy tolls on travellers.in such carriages be taken away. I can conceive of no implication tending to such a result, which would not obviously do violence, to the language of the statute, as it would to every ¿orrect rule of construction^ and to every intendment consistent with the natural and plain objects of the law. The fact-that •the state has exacted tolls on passengers in the stages carrying the mails, only beyond- a certain number of carriages so employed, can by no-correct reasoning .affect the right of the state in this matter, however, it might be received as a.measure either of policy or liberality ; for having the power ¿bsolutely 'to exact tolls of all travellers on the„road hot exempted- by the proviso,- this power carried 'with it, by every sound rule of logic', the right to discriminate be-, tween the subjects of her power. She had then a perfect right to declare .that travellers in specified carriages carrying the mail should ■ pass free of toll, and that those transported in other vehicles, although bearing the mail, likewise should be subjected to the payment of toll. Such a regulation the state had the power to enact, had -it -been the dictate of mere caprice. A correct apprehension, however, of her policy and ■ interests in reference to this road, and in reference'to the accommodation of the public, will develope a more enlarged and more equitable motive for the measures adopted by the .state--showing those measures.to have been produced • fry the
 
 *748
 
 force of supervening circumstances. It cannot be denied, that in assuming the management of this road, the purpose of the state was to maintain and preserve it as a commodious highway. By the title qf the law passed for its assumption, viz., “ An act for. the pre-. servation and repair of the United States road,” as well as by every clause and provision of that law, this object is clearly evinced. It is equally undeniable, that the means in contemplation for the accomplishment of this object were the usual and natural means by which artificial highways are supported, viz.: the tolls ■ collectable on travellers and on property transported upon it. The concession to the federal government of the free passage -of a portion of its mails over this road, and of the vehicles in which they might be carried, was an act of fairness and liberality which should not be made the pretext for abuse and monopoly, such as must, if permitted, dry up . the source whence the means of maintaining the road are to be derived, and which would opera.te for the exclusive advantage of the favourites of such monopoly, and for the serious injury of the public. To guard against consequences like these, the power reserved by the-15th section of the law of Í-1831 was retained by the'state, a power xpressly recognised to Its full extent by the act of Congress adopting the former law; and it can as little be doubted, that, in the practical experience of those consequences,.and in the intention of applying a remedy for them, the law of Ohio of March - 9th, 1838, and the‘order of the Board of Public -Works of the same state, had their origin.
 

 But it is argued that the exaction of tolls on travellers in stages carrying the mails, would be a violation of the compact between the two governments, because it wovdd enhance the demands of- contractors for transporting the mail, and thereby become a fax upon the federal-treasury, aua in the same degree an impediment to the conveyance of the mails. It is á sufficient reply to. such an argument to,remark, that neither the law of Ohio nor the act of Con-, gress adopting that law, stipulates any exemption from tolls on travellers, but the exemption is limited'to carriages only; and it is an inflexible rule of contract, too familiar to be commented on here, . that neither party, singly, can superadd a term or .condition to. a contract completed. This argument is therefore utterly without force, even if the effects it seeks to deduce could be demonstrated. It is'fallacious too in' another respect. The monopoly in support pf which it is adduced, by enabling thé mail contractor to drive off all competition, whilst it puts it in his power to withhold the .tolls by payment of which the road would be supported, enables, him to practise the very extortions upon the government which . fair competition would be the surest means of preventing. But conceding, for thp moment, that a denial to the contractor of the privilege now contended for, might enhance the price of transporting the mails, the question still very properly arises, whether.this effect
 
 *749
 
 (were the language of the law even doubtful) would justify, the extension to him of such a privilege ? A just view of the legislation of both the state, and federal governments, and of the obvious purposes of that legislation, must compel a negative answer to this) question. The purposes designed by this' legislation were the preservation and repair of the National road. Such are the objects announced, no,t only in the titles of the laws themselves, but provided for in all their enacting sections ; and the
 
 quo modo
 
 declared by these enactments is the levying of tolls. Is it then reasonable or logical, or rather is it npt inconsistent and contradictory, to attempt to deduce from them; conclusions which fall not within their terms, but which go to defeat every end which must-have been within the contemplation of the parties.; for which indeed these enactments all profess to have been made. Is not this attempt in violation of all rules foj the construction either of statutes or' contracts,' which always preserve the main and obvious intentions of legislators or of contracting parties, to the exclusion of minor though seemingly contradictory considerations ?. But the language of these laws is by ho means equivocal. Except for the exemption contained in the.sécond proviso of the 4th section of the Ohio statute of 1831, all mails and the carriages in which they are transported, the-troops, arms, and property of the United States of every description, would have been subject to the payment of tolls; and the exemption can be extended no farther than the plain and natural import of the language of that-proviso will justify.
 

 Again, it has been said, that the exaction of tolls from travellers in the mail-stages would be a. violation of the contract, because by such a demand travellers would be excluded .from those stages, and that the safefy. of the mails would be endangered by this exclusion; it being assumed by this argument that the travellers are to constitute a guard to the mails. To this seemingly strange and farfetched. argument, it might be sufficient to answer, as was done to the former, that no stipulation for the transportation of such a guard, (if by any violence to language ordinary casual wayfarers could be so dehominated,) is contained in the contract; and that the attempt thus to introduce any such stipulation or engraft it upon that contract, is a palpable and unwarrantable interpolation upon its terms and its objects. In the next place, the propounders of this argument may be challenged to show either the duty or the willingness of such travellers, to hake upon themselves the hazards, the trouble, or the responsibilities of guarding the United States mails. With equal cogency may those who thus reason be called upon to prove, that amongst tlie promiscuous multitudes who travel in stages, there may not be comprised those who roam the country with the viéw of committing depredations, and from yffiose designs, the safety of the mails may be most endangered.
 

 Upon a full consideration of this case, I am brought to conclude,
 
 *750
 
 that the acts of. the legislature of Ohio, subsequent in date "to the 2d of March 183.1, and the proceedings of the. Board of Public Works of that statej founded upon those statutes, áre in violation of no principle or right guarantied by the -Constitution of the United States, nor of any acts, of .Congress passed in pursuance thereof; nor of any contract at any time existing between the state of Ohio and the federal government. I am farther of opinion, that the aforesaid laws of Ohio' were on the contrary designed, and are of a tendency, fairly and justly, to distribute the foils collectable within her limits, on the road in question, so as to make them properly' subservient to the view's of the federal government and of the governmént of Ohio, at the times of passing of the .state law of February 4th, T831, and the act of Congress of the 2d. of March,. 1831; and in conformity with the express language of those laws; and to prevent unwarrantable monopoly, and serious if not fatal detriment to the road. I think that the decision of the Supreme .Court.of Ohio, being a correct exposition - of the laws, designed to ■ effect these important objects; ought.therefore to ne affirmed.