# STATE EX REL. GOSHEN IRRIGATION DISTRICT
## v. HUNT, SECRETARY OF STATE

(No. 1947; May 5, 1936; 57 Pac. (2d) 793)

For the defendant and in support of his demurrer, there was a brief by *Ray E. Lee,* Attorney General, *Thos. F. Shea,* Deputy Attorney General and *Wm. C. Snow,* Assistant Attorney General of Cheyenne, and oral arguments by *Messrs. Lee* and *Snow.*

For the relator, there was a brief by *Reid & More* of Torrington and oral argument by *Erle H. Reid*.

RINER, Justice.

The relator, Goshen Irrigation District, commenced this action in this Court against the defendant, Lester C. Hunt as Secretary of State of the State of Wyoming, praying that an alternative writ of mandamus be issued to the officer named, commanding him, upon payment of his proper fees, to issue to relator official license plates for a certain motor truck owned by it, or to show cause why he should not do so.

The averments of the plaintiff's petition so far as necessary to an understanding of the questions presented are substantially these:

That the Goshen Irrigation District aforesaid was organized more than twelve years ago by a decree of the District Court of Goshen County, Wyoming, pursuant to the provisions of Article 7 of Chapter 122, Wyoming Revised Statutes, 1931, and acts amendatory and supplemental thereto, that in December, 1904, the Secretary of the Interior of the United States filed with the State Engineer of the State of Wyoming, an application for a permit to construct a reservoir to be known as the "Pathfinder Reservoir," near Alcova, Wyoming, to utilize the water supply of the North Platte River in this State pursuant to the provisions of the Act of Congress popularly known as the Reclamation Act, and also certain applications for secondary permits for the use of the water to be stored in said reservoir, among which was one to construct the Fort Laramie Canal. Inferentially it may be gathered from the petition that the reservoir aforesaid was constructed, though it does not appear to be positively so alleged. The canal last mentioned, it is stated, heads near Whalen, Wyoming, and extends thence more than one hundred miles south-easterly across the Wyoming and Nebraska State line to a point about south of the town of Gering, Nebraska, and supplies water for the irrigation and reclamation of a large land acreage.

During the year 1923, the relator was organized, and at that time eighty per centum of the lands lying under said Canal in Wyoming were public lands of the United States or unperfected homestead entries. For about three years thereafter the relator obtained water for the lands within it under annual rental contracts made with the United States, but under date of November 24, 1926, relator entered into a contract with the

United States of America providing for acquiring a permanent water right for said lands. A copy of this contract was placed in the files of this cause, and we shall regard it—as was stated on the argument had herein without question—to be an accurate one and proper to be considered in conjunction with the petition in this case.

Under that contract, effective December 31, 1926, the care, operation and maintenance of that portion of the main Fort Laramie Canal of the Fort Laramie Division of the North Platte Project, extending from Station 12 to the Wyoming-Nebraska State line, all lateral distributaries, drainage channels, dams, dikes, protective works and structures constructed for the benefit of the lands of the District under said Fort Laramie Division, all buildings in Wyoming used for operation purposes in connection with said Fort Laramie Division, except those reserved for the United States, was transferred to the Goshen Irrigation District aforesaid, but it was expressly provided that no title to any of the works was passed to said District and that at its own cost the care, operation and maintenance of these works should be conducted by the District, pursuant to law, regulations of the Secretary of the Interior and the contractual obligations affecting the same. The contract aforesaid also provided for the repayment by the District of the United States of the District's proportionate share of the costs of the works serving its lands.

In connection with the North Platte Project the Bureau of Reclamation of the United States has constructed southwesterly from the town of Lingle, Wyoming, on the North Platte River a hydroelectric plant, known as the Lingle Power Plant, and under the provisions of said contract the said District agreed to carry for the United States in the Fort Laramie Canal,

such waters as the United States would require for the operation of this power plant, and the District has continuously from November 24, 1926, carried and delivered to the United States the waters for the operation of said plant. The compensation to be paid the District by the United States for this service was by the contract set at a fixed sum, or if at any time after January 1, 1930, this sum became, in the opinion of the Secretary of the Interior, unfair to any party to the contract, then and thereafter the United States would pay to the District annually a sum to be fixed by the Secretary representing a fair and adequate compensation for expenses incurred and property used by the District in "so carrying said water to said power plant." If a break should occur in the Canal the United States agreed to pay to said District fifty per cent of the cost of repairing such break, "as such cost is finally determined by the Secretary" of the Interior.

Under and irrigated by the said Fort Laramie Canal lies a large acreage of lands in Scotts Bluff County, Nebraska, and pursuant to the provisions of said contract the District agreed to carry for the United States, through said Fort Laramie Canal, such waters as the United States would furnish and require for the irrigation of said lands and to deliver such waters at the Wyoming-Nebraska State line in the main canal and laterals leading therefrom as then constructed, and the District has since November 24, 1926, and is now performing the contract in these particulars, as agreed. The compensation to be paid the District by the United States for this service was settled by the contract at "an equitable amount to be fixed annually" by the Secretary of the Interior.

In order that the District may carry on its operations it collects through the proper taxing officials of Goshen County, Wyoming, annual assessments for

maintenance and operation based upon budgets approved each year by the District Court of said County. "None of the operations of the District," so it is alleged, "are calculated to provide a profit and its operations are carried on at actual cost and expense to its landowners."

It is further alleged that under date of March 14, 1935, the Goshen Irrigation District "required for its use in and about the care, maintenance and upkeep" of the works transferred to it by the United States under the aforesaid contract of November 24, 1926, a 1½ ton motor truck, which it accordingly purchased; that thereafter, the District, by its Manager, applied to the defendant, Lester C. Hunt, the Secretary of State of the State of Wyoming, for registration of said motor vehicle as a publicly owned vehicle, under the provisions of Section 72-101, Wyoming Revised Statutes, 1931, (evidently Section 72-102, Wyoming Revised Statutes, 1931, is meant), and on April 24, 1935, the defendant refused to register said truck as requested, that thereafter, the said District again made a similar application to the officer aforesaid, and he on May 8, 1935, a second time refused its application for license for said truck as a publicly owned vehicle, despite it being, as it is said, his ministerial duty under the section of the law cited last above to issue such a license for said truck to relator. It does not appear to be alleged that the amount of the cost of the plates for the truck was tendered by relator to the official.

Relator's petition additionally alleges that while the District Court of Laramie County has concurrent jurisdiction with this Court in this matter, "to initiate this action in said District Court in the first instance would be but to subject the parties hereto to needless expense and would by the time thus involved delay the decision of this matter, which is of large public interest. No

question of fact need be determined by this Court and its final disposition will not involve the taking of any testimony, but the case can be disposed of solely by the decision of a question of law."

An alternative writ of mandamus was issued persuant to the prayer of the petitioner of relator against the defendant, who has appeared by the Attorney General of the State and filed a demurrer to the petition upon these grounds:

"1st. That no circumstances are shown in the petition of relator for the writ of mandamus sufficient to render it necessary or proper that the writ should issue originally from this Court rather than from a District Court of this State;

"2nd. That the facts stated in the petition do not constitute a cause of action."

The Statute of this State on which the controversy between the parties has arisen is Section 72-102 Wyoming Revised Statutes, 1931, already mentioned, which reads:

"All motor vehicles of which the United States, state of Wyoming, or any county, city, town or other legal subdivision of the state, is the legal owner, shall be exempt from the payment of fees prescribed in this article; provided, that all such vehicles shall be marked to show such ownership. The secretary of state shall, upon application by the proper official issue, at cost, to the owners of such vehicles, distinctive plates indicating such public ownership."

Relator contends that it is a "legal subdivision of the State" within the purview of this Section, although it is not specifically mentioned by the language contained in the Section. So far as mere verbiage goes, it may be conceded that in the sense of having fixed boundaries within this State and having been created by law for the exercise of certain powers, the relator is a legal subdivision. But the real question is whether it was the intention of the Legislature in employing the language

it did in said section to exempt said relator and other irrigation districts in this State from the payment of the fees described in the Article of which the section aforesaid is a part. That intention must be ascertained by an examination of the law in the light of the fixed rules of judicial interpretation of statutes, of its subject-matter as an entirety and the peculiar nature of relator as a corporate entity established by law. It is obvious, also, that the same word or phrase may have different meanings as it is controlled by the connection in which it is employed, the evident purpose of the statute where it is used or the subject-matter to which it relates.

The Goshen Irrigation District, as are all similar irrigation districts of this State, was created under legal provisions which have been incorporated in Article 7 of Chapter 122 of the Wyoming Revised Statutes, 1931. It thereby became a corporation possessing certain enumerated powers, among which, briefly, are these: To sue and be sued, to adopt and use a corporate seal, to have perpetual succession; to file on and acquire the right to the use of water for domestic and irrigation purposes; to acquire sites for reservoirs and rights of way for ditches, canals and laterals and to exercise the power of eminent domain therefor; to contract with the State of Wyoming for the reclamation and segregation of public lands pursuant to state and federal law, to contract for the sale of water rights it has acquired and to purchase and acquire state lands; to acquire by purchase or otherwise irrigation works, water rights and land and other property and to sell, lease or otherwise dispose of the same; to buy, develop, sell and distribute electrical energy as an incident to the ownership, control and operation of irrigation works and the co-operative works of the district and the United States as the dis-

trict may deem expedient or suitable for its development, and through defined legal procedure may collect assessments for construction and maintenance of its irrigation works from the benefited lands. It will be observed that the relator has a great many of the powers of corporations organized for gain or profit, as well as several powers not usually possessed by them.

This Court in Sullivan v. Blakesley, 35 Wyo. 73, 246 Pac. 918, indicated that while such an irrigation district was to be regarded as a public corporation rather than a private one, it was not a municipal corporation as that term is generally understood. In that case it was also said that irrigation districts were not "subdivisions of any city, town, village or county in the state," citing Thaanum v. Irrigation District, 72 Mont. 221, 232 Pac. 528, where it was held that Section 1 of Article 13 of the Montana Constitution, which prohibited the state or any county, city, town, municipaltiy or other subdivision of the state from becoming a shareholder or joint holder of stock in corporations, excluded irrigation districts, which were not meant by the cited section's use of the phrase, "other subdivision of the state," and could accordingly hold and own corporate stock.

Relator, in support of its contention, as stated above, refers to the fact that annual assessments for maintenance and operation are collected through the proper taxing officers of the county. However, concerning the nature of these assessments it was pointed out in the case of Sullivan v. Blakesley, supra, that:

"The exactions authorized to be made by such districts may, in a broad sense, be termed taxes, but they are distinguishable therefrom, for they are levied for local benefits to be spread on the property in the districts in proportion to the peculiar advantages accruing to each parcel therein from the improvement made. Whether in the form of special assessments or in the

form of taxes, they are essentially assessments for local benefits and not levied for general governmental purposes."

In Buffalo Rapids Irrigation District v. Colleran, 85 Mont. 466, 279 Pac. 369, it was held that notwithstanding the provisions of Section 2 of Article 12 of the Montana Constitution exempting from taxation "the property of the United States, the state, counties, cities, town, school districts, municipal corporations and public libraries," (Compare Section 12 of Article 15 of the Constitution of Wyoming), a county was authorized to assess and levy taxes on land owned by an irrigation district organized under Montana law. The unsuccessful contention was made that irrigation districts as public corporations fell within the designation "municipal corporations," or were such component parts of the state that it could or should be said that their property was property of the state. Rejecting this contention, in the course of the opinion filed, it was remarked that:

"It would seem that, in order to come within the rule which will permit the court to consider the property of a public corporation the property of the state for the purpose of exemption from taxation, such corporation should be so closely engrafted upon the state as to in fact exercise governmental functions and be supported, directly or indirectly, by the state.

\* \* \* \* \* \*

"Further, while it is declared that irrigation districts are created to promote the welfare of the state, the state as a whole, the counties and school districts within which such districts may lie are benefited only incidentally, by reason of the increased valuations placed on the lands within the districts because of the special improvements made thereon and the increased prosperity of the owners of the land. The direct benefit accrues to the land improved and the owners thereof. Board of Directors of Payette Oregon Irrigation District v. Peterson, above. (Cited below). Irrigation

districts are not created with a view to benefit the state or to organize a corporation for the discharge of governmental functions in addition to, or in aid of, the usual governmental departments or agencies, but in order to promote the material prosperity of the few owning property within their bounderies just as truly as are manufacturing plants established or mines and oil wells developed. In so far as each of these projects bring into being new sources of revenue to the state, they promote the welfare of the state, but the mere production of additional values or property does not, in itself, warrant the exemption of the property from taxation, so long as that production is accomplished for private gain."

A portion of the foregoing excerpted language was quoted with approval in the later case of Newman v. Bitter Root Irrigation District, 95 Mont. 521, 28 Pac. (2d) 195, where the nature of an irrigation district under under Montana law was again a subject for investigation and disposition.

So in Columbia Irrigation District v. Benton County, 149 Wash. 234, 270 Pac. 813, it was held that farm property within the boundaries of an irrigation district the title to which was acquired by the district on account of failure of owners to pay their assessments, was not exempt from taxation either as property of the state or as property of a municipal corporation. The court said in part:

"The Constitution provides that the property of the United States, the state, counties, school districts, and other municipal corporations shall be exempt from taxation. Reading the language 'other municipal corporations' in connection with what immediately precedes it, it seems clear that the framers of the Constitution did not intend to include within that exemption irrigation districts which are not municipal corporations, in the strict and proper sense, but are corporations which are organized primarily for the benefit of the property owners within the district and which have no civic governmental powers or functions. It is unnecessary

here to repeat the reasoning in Board of Directors of Middle Kittitas Irr. Dist. v. Peterson, supra, (4 Wash. 147, 29 Pac. 995) and In re Riverside Irrigation Dist., supra. (129 Wash. 627, 225 Pac. 636)."

The Supreme Court of Oregon in Board of Directors v. Peterson, 64 Or. 46, 128 Pac. 837, 129 Pac. 123, had occasion to characterize irrigation districts created in that state as compared with other quasi municipal corporations, and used this language:

"Quasi municipal corporations, such as road districts and school districts, are governmental, and exercise their powers as auxiliaries of the State; and in that sense are public.  *   *   *   *   *   *

"On the contrary, in the irrigation districts provided for here only the land is benefited or burdened, and only the land owner has any interest in the choice of its officers, or is in any way concerned in their acts. The management of the district affairs is solely of the irrigation project in the private interest of the land owners,  *   *   *   *   *   *   The purpose of this law is similar to the provision for local improvement in a city, such as street paving, where the owners of the land affected only are consulted."

So in Holbrook Irrigation District v. First State Bank, 84 Colo. 157, 268 Pac. 523, the nature of an irrigation district in the State of Colorado is described in these words:

"While an irrigation district is a public corporation, we do not think that it is in any true sense a branch or subdivision of the sovereignty. Its purposes are chiefly private, and for the benefit of private landowners. See Interstate Co. v. Montezuma District, 66 Colo. 219, 181 P. 123. In Colorado, I. & R. Co. v. Riverview Drainage District, decided April 2, 1928, reported in 266 P. 501, this court held that a drainage district (which like an irrigation district has a limited power of taxation) is not a subdivision of the state or a mere agency created for governmental purposes, and that such district can be sued without a statute expressly authorizing such suit."

Where land was acquired by an irrigation district through the non-payment of delinquent assessments, it was held in Lewiston Orchards Irrigation District v. Gilmore, 53 Idaho 377, 23 Pac. (2d) 720, that within the meaning of a clause of the Idaho Constitution (Article 7, Section 4), practically identical in terms with that from the Montana Constitution quoted above, such property was not exempt as property of "municipal corporations" from general taxation while owned by the irrigation district. The language of the court in City of Nampa v. Nampa & Meridian District, 19 Idaho 779, 115 Pac. 979, was quoted to the following effect:

" ' "An irrigation district is a public quasi corporation, organized however, to conduct a business for the private benefit of the owners of lands within its limits. (They are the members of the corporation, control its affairs, and they alone are benefited by its operations.) It is, in the administration of its business, the owner of its system in a proprietary rather than in a public capacity, and must assume and bear the burdens of proprietary ownership." ' "

After reviewing other authorities, the Court further said:

"It follows that the primary purpose of an irrigation district is limited to the conducting of its business for the private benefit of the landowners within the district by the acquisition of water rights and the irrigation of lands within its boundaries; and that the landowners within the district are the members of the corporation, control its affairs, and they are primarily benefited by its operations. It is likewise true that irrigation districts have been endowed with certain incidental municipal powers necessary to its proper functioning, such as the election of its officers and directors, the levy of assessments for bond, interest, maintenance, and operation and other like authorized purposes, and the equalization and collection of such assessments, which incidental municipal powers have resulted in its classification as a quasi municipal or municipal corporation in connection with the construction of statutes

and constitutional provisions involving the exercise of such municipal powers."

The conclusions thus expressed were briefly reiterated by the court in Eldridge v. Black Canyon Irrigation District, (Idaho) 43 Pac. (2d) 1052.

Relator has cited a number of cases relating to irrigation districts from the State of California, Turlock Irrigation District v. White, 186 Calif. 183, 198 Pac. 1060, 17 A. L. R. 72, being typical, where the property of such districts was considered as exempt from taxation. But the rule appears to be established in that State that under the provisions of the California Constitution the property of an irrigation district is state owned property and as such exempt. That is not the status of the property of an irrigation district in either Idaho or Montana, as we have seen. From their inception the property of such organizations in Wyoming has never been regarded as state owned, and we think properly so. Irrigation districts in this State in their status and functions more closely resemble those in the two states above named whose decisions have been already reviewed delineating their characteristics.

Stress is laid by the relator on the fact that none of its "operations" are calculated to produce a profit, but are carried on at actual cost and expense to the landowners within its boundaries. That doubtlessly is so at the present time, but under the powers which have been given it by law and enumerated above, there is no reason why such operations should not and might not be in the future "calculated" so as to produce a profit. Of course, the fundamental purpose of the District, as pointed out in the cases hereinabove summarized, is to enable its land owners to operate their lands at a profit. We are unable to perceive therefore, that as our law now stands decisions from other jurisdictions are pertinent which indicate a state policy to exempt irriga-

tion districts from taxation. Our Constitution, which in Section 12 of Article 15, supra, reads:

"The property of the United States, the state, counties, cities, towns, school districts, municipal corporations and public libraries, lots with the buildings thereon used exclusively for religious worship, church parsonages, public cemeteries, shall be exempt from taxation, and such other property as the legislature may by general law provide,"

does not declare any such exemption, and the Legislature has not in terms so provided.

We are inclined to think that Section 72-102, supra, exempting publicly owned vehicles from the payment of the fees required by Chapter 72, supra, and amendatory legislation, and the issuance of license plates to them at cost, should be viewed in the light of the familiar principle that a statutory grant of exemption from taxation is never presumed, must be clearly conferred in plain terms and should be strictly construed. 61 C. J. 393, 394, and cited cases; 26 R. C. L. 313, Section 274. While the fees referred to by the section of the law in question are not taxes in a broad sense, yet they are of such a character that an exemption from their payment necessarily is productive of inequality in contributions to the common burden of highway construction and maintenance, as well as inconsistent with the general policy of our laws, and hence calls for the application of the rule above mentioned.

There is also pertinent here the maxim frequently employed in statutory construction known as "ejusdem generis," which is to the effect that where general words are added to an enumeration or designation of particular subjects or classes, the general words do not explain or amplify those preceding them, but are themselves limited and explained by the terms used in the antecedent list. 59 C. J. 981 and cases cited; 25 R. C. L. 996, Section 240.

Upon application of these rules in the interpretation of Section 72-102, supra, keeping constantly in mind the true nature and characteristics of irrigation districts under the Wyoming law, as hereinabove indicated, we are led irresistibly to the conclusion that the relator was never intended by the Legislature to be included within its terms. The relator is manifestly not brought within the operation of the statute by unmistakable designation therein. The subjects and classes enumerated and preceding the general words "other legal subdivision of the state" are the United States, the State of Wyoming or its counties, cities and towns. They are, it is evident, either sovereignties or agencies thereof established for truly or essentially governmental purposes. That being so, these general words must be restricted to embrace agencies like school districts and such other bodies with civic governmental powers akin to the classes listed as the Legislature may create in the future, as for instance, villages. .An irrigation district not being a municipal corporation, but being a corporation established for purposes chiefly private and with powers conferred mainly for the benefit of its own land owners, may not accurately be considered as coming within the purview of this exemption section of the law.

Among the rules governing the judicial interpretation of statutes, there is still another than those already suggested, which leads likewise to the same conclusion as announced above. "It is a well settled rule," says 25 R. C. L. 1043, Section 274, "that the contemporaneous construction of a statute by those charged with its execution and application, especially when it has long prevailed, while not controlling, is entitled to great weight, and should not be disregarded or overturned except for cogent reasons, and unless it be clear that such construction is erroneous." In the matter at bar Section 72-102 W. R. S., 1931, supra, was enacted

in its present form by the Legislature of 1921 (Laws of Wyoming, 1921, Chapter 69, Sec. 2), but previously by Sections 3475 and 3476 Wyoming Compiled Statutes, 1920, motor vehicles owned by the United States, the State of Wyoming, or by any county, city or town in this State, had been excepted from the operation of the license provisions of the state motor vehicle law. The phrase "or other legal subdivision of the state" was added to the enumerated list of public owners by the Act of 1921. During all the years since 1921 it has never been the practice of the Secretary of State to issue license plates at cost, under the law last mentioned, for vehicles owned by irrigation districts, but we understand they have been in all such cases treated as private corporations for profit would be. The law, for the most part, in its present form, authorizing the formation of irrigation districts, was enacted at, and has been operative since, the Special Session of the Fifteenth Legislature convened January 26, 1920.

It is the further contention of relator—and one not briefed by defendant's counsel—that the Goshen Irrigation District is a federal agency, and hence not subject to payment of the fees prescribed by the laws of this State to entitle it to operate upon state highways. This is said because of the legally authorized contractual relations existing between it and the United States through the Secretary of the Interior and which have hereinbefore been described in some detail. It is argued that whenever the State of Wyoming or Goshen County imposes a tax levy of any kind upon the Goshen Irrigation District or its property, it is directly taxing a United States agency; that the District has no funds for operation except those raised by maintenance and operation assessments against lands in the District and the sums paid to it under the above described contract of November 24, 1926, by the United States, and that every item of tax that the District has to pay is im-

mediately chargeable upon the United States for relator's services under the contract aforesaid.

A comparatively recent and concise discussion by the National Supreme Court, the ultimate authority on the matter, concerning the immunity of federal agencies from the taxing power of the state, appears in Fox Film Corporation v. Doyal, 286 U. S. 123, 52 S. Ct. 546, 76 L. Ed. 1010, to this effect:

"The principle of the immunity from state taxation of instrumentalities of the federal government, and of the corresponding immunity of state instrumentalities from federal taxation—essential to the maintenance of our dual system—has its inherent limitations. It is aimed at the protection of the operations of government (McCulloch v. Maryland, 4 Wheat. 316, 436, 4 L. Ed. 579), and the immunity does not extend 'to anything lying outside or beyond governmental functions and their exertion.' (Indian Motorcycle Co. v. United States, 283 U. S. 570, 576, 51 S. Ct. 601, 603, 75 L. Ed. 1277.) Where the immunity exists, it is absolute, resting upon an 'entire absence of power' (Johnson v. Maryland, 254 U. S. 51, 55, 56, 41 S. Ct. 16, 65 L. Ed. 126), but it does not exist 'where no direct burden is laid upon the governmental instrumentality, and there is only a remote, if any, influence upon the exercise of the functions of government' (Willcuts v. Bunn, 282 U. S. 216, 225, 51 S. Ct. 125, 127, 75 L. Ed. 304)."

And it was there decided that copyright royalties were not immune from state taxation as an instrumentality of the federal government, though a copyright was a property right created by federal statute to accomplish a governmental purpose.

In a previous case, Fidelity & Deposit Company of Maryland v. Commonwealth of Pennsylvania, 240 U. S. 319, 36 S. Ct. 298, 60 L. Ed. 664, the same court held that a surety company by serving as surety on bonds required by the United States, being authorized so to do by Congressional Act of 1894, (28 Stat. at L. 279) did not act as a federal instrumentality so as to exempt

it from state tax on the premiums the company received, exacted from foreign corporations for the privilege of doing business within the state, and Mr. Justice McReynolds remarked in that opinion:

"But mere contracts between private corporations and the United States do not necessarily render the former essential governmental agencies, and confer freedom from state control. Baltimore Shipbuilding & Dry Dock Co. v. Baltimore, 195 U. S. 375, 49 L. Ed. 242, 25 Sup. Ct. Rep. 50."

It was contended without success by the plaintiff in Six Cos., Inc. v. DeVinney, 2 F. Supp. 693, a suit to restrain the defendant from collecting state taxes upon its personal property as well as certain poll taxes, that in performing its contract for the construction of the Hoover Dam, power plant and appurtenant works it was a federal agency and hence entitled to immunity from such taxation. The court pointed out that:

"The case of a corporation contractor for the construction of public works is one in which, if it may be said to be an instrumentality of the government, its relations to the government are nevertheless purely contractual. It does not exercise governmental functions. It undertakes to construct according to plans and specifications adopted by officials of the government. It is organized for that and similar purposes and its primary object is to comply with the conditions of the contract for the profit to be made in so complying."

A very well considered case is that of State of Washington v. Wiles, 116 Wash. 387, 199 Pac. 749, 18 A. L. R. 1163, where the facts were briefly that Wiles held a written contract with the federal government, whereby he agreed to carry the United States mail between certain places in the City of Seattle. In doing this he used various motor trucks and they were used only in this business. The contract obliged him to provide and keep in repair the necessary vehicles for this work, to furnish all necessary oil, gasoline, etc. for their upkeep, and to use them only in the business of carrying the

mail. He was arrested and convicted of failing to obtain a state license for one of these motor trucks, which he was then using on the public highways of the State of Washington in the performance of his contractual duties. Similar contentions were presented in Wiles' behalf as in the case at bar, and reliance likewise placed upon the cases of McCulloch v. Maryland, 4 Wheat., 316, 4 L. Ed. 579, and Johnson v. Maryland, 41 Sup. Ct. 16, 254 U. S. 51, 65 L. Ed. 126. Affirming the judgment below and rejecting these contentions, after reviewing the authorities, the court said:

"The appellant admits, and under like circumstances all the courts have held, that the state has the right to levy a property tax on motortrucks owned by him and used in the transportation of the mail. In making his contract with the government he doubtless took into consideration this tax, and it would be in effect passed on to the government in identically the same way that he contends the license tax must be passed on to the government. We have in this state a statute which requires every person driving or operating a motor vehicle to obtain a driver's license before he will be permitted to operate such vehicle. If the state cannot compel appellant to pay the motor license tax, for the same reason it cannot compel him to license his drivers or himself as a driver. We also have a law in this state imposing a small tax on each gallon of gasoline sold. This tax is by the gasoline companies charged to the consumer, including the appellant, and he doubtless will, if he should renew his contract with the government, pass that tax also on to the government; and, if he be exempt from the motor tax, he is for the same reason exempt from the gasoline tax. Other like illustrations might be given.

"While it is true, generally speaking, that a state may not by its laws hamper and interfere with the free and orderly performance of governmental functions, by taxation or otherwise, yet that interference must be substantial and direct. Every indirect and immaterial interference with the conduct of government business is not violative of the principles upon which

the federal government is founded and performs its duties. The rule of reason must control in all such questions; otherwise the states will be greatly hampered in the conduct of their affairs, without any corresponding benefit flowing to the national government."

A like conclusion was reached on quite similar facts by the Texas Court of Civil Appeals in Moody v. Louwein, 300 S. W. 957. This decision was subsequently reversed by the Texas Commission of Appeals in Louwein v. Moody, 12 S. W. (2d) 989, that court considering the earlier cases of Searight v. Stokes, 3 How. 151, 11 L. Ed. 537, Neil, Moore & Co. v. Ohio, 3 How. 720, 11 L. Ed. 800, Achison v. Huddleson, 12 How. 293, 13 L. Ed. 993, to "settle the matter of 'practical effect' as increasing the cost to the United States of execution of its power and duty (Section 8, cl. 7, art. 1) to establish and operate post offices, etc., and that, too, in a way sufficiently direct as to be an interference with the free execution of that power."

However, the comparatively recent decision in Tirrell v. Johnston, 86 N. H. 530, 171 Atl. 641, is an authority which may not be overlooked. It presents a careful and painstaking review of the federal Supreme Court case law touching the point, as we see it, in which we are now interested. That case was a bill in equity brought by Tirrell against the Attorney General and State Treasurer of the State of New Hampshire, to enjoin them from prosecuting him for failure to pay the state two cent gasoline road toll charge. His pleading set forth that he was a United States rural mail carrier; that delivery of the mail was by means of an automobile furnished at his own expense and for the use of which he received a governmental allowance of one cent a mile. In support of his refusal to pay this toll charge, he advanced the contention that he was an agency of the government and hence immune there-

from. The court disallowed this claim. Akin to the fees charged the citizens of Wyoming generally for license plates, and which relator claims it is exempt from paying, the gasoline road toll charge, aforesaid, it was indicated, was one made for the use of the New Hampshire highways.

Asserting the right of the state to make a reasonable charge for the use of these facilities furnished, as respects federal government use thereof, the court said:

"While the agents of the federal government are exempt from state interference with the discharge of their federal functions, they have no warrant to demand from the states any form of free service of a class for which all others must pay. The fact that a state may be acting in a governmental capacity does not authorize the general government to demand the fruits of such activities. The federal government has no more right to demand free services from an individual state than from an individual man.

"The charge here demanded is payable by the plaintiff, whether he is or is not to be regarded as representing the federal government in the purchase of gasoline. The demand being for no more than reasonable compensation for the use of the highways, it is payable by the United States as well as by all others."
Distinguishing the case of Panhandle Oil Co. v. Knox, 277 U. S. 218, 48 Sup. Ct. 451, 72 L. Ed. 857, 56 A. L. R. 583, it was observed that:

"The plaintiff in this case is called upon to furnish his own transportation, for which he receives a small allowance. That allowance is at a fixed sum per mile of travel. It does not depend upon how much or how little the cost of such transportation may be to him. It is clear that the circumstances put the situation farther away from any interference with governmental activities than the Panhandle Case. The tax there in question was held to be invalid upon the ground that it directly increased the cost of government. In the language of the opinion the result was 'to tax the United States.' There is no such element here.

"The charge is not laid because the gasoline is to be used by a federal agency. It is of course true that a discriminatory charge, imposed upon such grounds, would be invalid. But there is no discrimination. The charge is not made because the plaintiff is to carry the mail, but because he is to operate an automobile upon the highways of the state. The plaintiff, in his capacity of purchaser of automobile fuel, stands like any other individual. He has not even been a purchaser intending to use the fuel solely in the performance of his official duties. It was conceded at the argument that he uses his car for private driving as well as in the delivery of mail.

\* \* \* \* \* \*

"While the freedom of the federal government from state taxation must be upheld, it does not seem to us that the theory is capable of rational extension so far as to include the present case within its scope. A conclusion of immunity from this charge could be sustained only by saying that such increased cost of operation to the carrier will have the effect of requiring the federal government to increase in the future the salary or allowance of its carriers. As above suggested, the same argument would extend immunity from a great variety of charges to a multitude of federal officials. And a like immunity for state agencies from many forms of federal taxation would follow as a matter of course.

"The argument applies, not only to sales to federal agencies, but to all persons having government contracts. If their purchases of materials and supplies are subject to a state tax, they must get more money for their product from the general government. No one suggests that this element is sufficiently related to governmental activities to warrant a claim of exemption. Its efficiency to create an exemption when there are sales by the government has been denied in terms. Group No. 1, Oil Corp. v. Bass, 283 U. S. 279, 51 S. Ct. 432, 75 L. Ed. 1032."

As a result of the late trend of authority, that private property put to a federal governmental use was not entirely immune from state taxation, in the judgment of the court was declared thus:

"The theory that property of a federal agency is immune from state taxation, regardless of the amount or nature of the tax, is only applicable to cases where the property is held in that capaciy. The recent cases referred to above seem to recognize this distinction. Property of an individual, although used in the performance of a federal duty, and even though essential to such performance, is not exempt from state taxation because of the use made of it. As on one hand it cannot be taxed because put to federal use, so, on the other hand, it is not exempt from taxes whose incidence depends upon other factors. In short, the federal use cannot be taxed, but the property is taxable."
Concluding its opinion the court said:

"In view of the recent decisions, and of the reasons for not extending immunity from taxation beyond burdens which are direct and borne by government in practice as well as in theory, we conclude that, if the charge here demanded were to be treated as a tax laid by the state in its sovereign capacity, it would not be invalid as an infringement upon federal immunity from state interference."

The case just reviewed was removed by appeal to the Supreme Court of the United States and the decision affirmed. Tirrell v. Johnson, 293 U. S. 533, 55 Sup. Ct. 238, 79 L. Ed. 641.

In the case before us, the motor truck is not owned by the federal government, but by the Irrigation District, a corporation of this State, as we have already indicated, established for the private benefit of its landowners. The petition of the relator does not even show that the truck was to be used solely in the performance of the contractual obligations assumed by the relator with the United States government. But even if that allegation were present, it is difficult to see, under the foregoing authorities, that such fact would create the immunity claimed.

Conceding that in maintaining and operating the Fort Laramie Canal transferred to it, the District is a governmental agency, in providing the means for such

maintenance it is not such an agency. It chose to purchase and use a motor truck instead of a team of horses and wagon. If it had selected the latter means, after April 1, 1935, its claim that the state sales tax applicable to the purchase price might not be collected by the State, would be quite as tenable as the claim now made. We think that neither position accords with the latest decisions of controlling authority as we are able to understand them. It is evident, as it seems to us, that not only is the incidence of the fees here sought to be avoided remote from a federal agency, but when the contract of November 24, 1926, is analyzed no burden whatsoever could or would fall upon the United States as a result of the charge, unless the federal government so desired. Reference has already been made to the fact that the District for its services under said contract receives a fixed sum only, or such sum as the Secretary of the Interior may determine therefor. That official, aside from the contract itself, controls the matter. No provision of this instrument has been called to our attention which throws upon the United States without limitation the expenses of the relator for maintenance and operation of the works committed to its care.

The contention that the relator has no funds except those paid to it by the United States and those raised by assessments for benefits imposed upon its lands, does not affect the matter in hand that we can perceive. See Buffalo Rapids Irrigation District v. Colleran, supra.

The cases of McCulloch v. Maryland, 4 Wheat., 316, 4 L. Ed. 579; Indian Motorcycle Co. v. United States, 283 U. S. 570, 51 Sup. Ct. 601, 75 L. Ed. 1277; Reed v. Commissioner of Internal Revenue, 34 F. (2d) 263, Johnson v. State of Maryland, 254 U. S. 51, 41 Sup. Ct. 16, 65 L. Ed. 126; Territory v. Annette Island Packing Co., 6 Alaska 585, and Marin Municipal Water

District v. Chenu, 188 Calif. 734, 207 Pac. 251, relied on by relator, cannot be regarded as applicable here. The principles they announce have been reviewed and distinguished by the cases hereinbefore cited, and need not be considered further.

The demurrer of the defendant to relator's petition will be sustained on the second ground thereof, it being unnecessary to consider the first. If no further pleading is filed within ten days the peremptory writ of mandamus will be denied.

KIMBALL, CH. J., and BLUME, J., concur.