THE WALGREEN COMPANY, a Corporation,
*Plaintiff and Appellant,*
vs.
THE STATE BOARD OF EQUALIZATION OF THE
STATE OF WYOMING,
*Defendant and Respondent.*

(No. 2331; March 12th, 1946; 166 Pac. (2d) 960)

For the plaintiff and appellant the cause was submitted on the brief and also oral argument of John C.

Pickett of Cheyenne, Wyoming, and Anthony F. Zarlengo of Denver, Colorado.

For the defendant and respondent the cause was submitted on the brief of Louis J. O'Marr, Attorney General, Hal E. Morris, Deputy Attorney General and Frank M. Gallivan, Assistant Attorney General, all of Cheyenne, Wyoming, and oral argument by Mr. Morris.

## OPINION

RINER, Justice.

This is an appeal proceeding brought to review a judgment of the district court of Laramie County which affirmed an order of the State Board of Equalization dated September 22, 1942, imposing an assess-

ment of $3,661.91 upon the complaining party. The Walgreen Company, under the provisions of Ch. 102, L. of Wyo. 1937, usually referred to as the "Selective Sales Tax Act of 1937". The Walgreen Company may conveniently be referred to hereinafter as the "appellant" or as the "Company" and the State Board of Equalization as the "respondent" or simply as the "Board". The controversy arises upon what shall be the proper construction of portions of several sections of this Act of the Wyoming Legislature above mentioned and the facts involved are not in dispute, the cause having been tried in the district court upon an agreed statement thereof.

So far as is necessary to understand the history of this litigation and the contentions of the parties the following statement, we think, will suffice:

There are but two questions presented by this record and they come before us in consequence of the fact that appellant has, in times past, been engaged in the business of operating drug stores in this state wherein it made retail sales of tangible personal property upon which it was required by the law hereinbefore cited, to collect sales taxes from its customers and to pay the same, with other taxes, to the Board aforesaid for the benefit and use of the State of Wyoming. The period of time thus included and concerning which the contentions of the parties are here advanced is somewhat more than three years, i. e., from January 1, 1939, to July 31, 1942, inclusive. Between these dates, as paragraph "3.(A)" of the "Agreed Statement of Facts" aforesaid informs us "the Appellant made retail sales of tangible personal property to its customers in amounts of 25c or more totalling $672,428.97, which amounts included alleged sales to employees, money received from photographic work, and interstate sales as hereinafter set forth; that from such sales of 25c or

more the Appellant collected from its customers a sales tax in the sum of $14,871.92". During this period of time also the "Agreed Statement" aforesaid states further in its paragraph "(B)" "the Appellant made retail sales of tangible personal property to its customers in amount of 24c or less totalling $286,809.30, upon which no sales tax was collected from the customers." It seems there were other items of taxes which do not appear to be in question now.

The portions of Ch. 102, above referred to, with which this controversy is particularly concerned are found in section "4" thereof reading:

"From and after the effective date of this Act, within the limitation herein set out, there is hereby levied and there shall be collected and paid:

"(a) An excise tax upon every retail sale of tangible personal property made within the State of Wyoming equivalent to two per cent. (2%), except as provided in subsection (e) of this Act, of the purchase price paid or charged, or in the case of retail sales involving the exchange of property, equivalent to two per cent. (2%) of the consideration paid or charged, including the fair market value of the property exchanged at the time and place of the exchange, except that, those commodities now bearing a State excise tax in excess of five (5) per cent. shall not be taxable under the provisions of this Act";

and "subsection (e)" of said section "4" to which "subsection (a)" above refers as an exception is as follows:

"The State Board of Equalization shall provide uniform methods and schedules for adding the tax or the average equivalent thereof to the selling price, and when added such tax shall constitute a part of such price or charge, shall be a debt from consumer or user to retailer until paid, and shall be recoverable at law in the same manner as other debts, and it shall be the duty of said Board to formulate and promulgate appropriate rules and regulations to effectuate the purpose of this Act; provided, that the tax on all sales of twenty-

four (24c) cents or less shall be one percent, and *provided further, that the purchaser, consumer and user of any single unit purchase: of twenty-four (24c) cents or less, shall not be required to pay the tax provided herein and provided further that the tax of one percent herein imposed on all purchases of twenty-four (24c) cents or less shall be assumed and paid for by the vendor who shall keep a detailed segregated record of all such sales.* Any vendor who shall so elect may, in lieu of keeping such detailed segregated record, pay a tax of two per cent. on his total sales upon which the tax provided herein is imposed."

After declaring that:

"Every person receiving any payment or considera-tion upon a sale of property or service subject to the tax imposed under the provisions of this act, or to whom such payment or consideration is payable, (hereinafter called the vendor) shall be liable and responsible for the payment of the entire amount of the taxes imposed and payable under this Act, and shall on or before the 15th day of each month, make a true return of the preceding months gross sales to the State Board of Equalization and shall remit all the taxes due the State from him to the State Board of Equalization. The vendor shall collect the tax from the vendee on all sales of twenty-five (25) cents or more, but in no case shall he collect as tax an amount (without regard to fractional parts of one cent) in excess of the tax computed at the rates prescribed by this Act. Such returns shall contain such information and be made in such manner as the State Board of Equalization may by regulation prescribe",

section 5 of this statute sets forth sundry other provisions which do not seem at present to concern us further. The law then directs that:

"*If any vendor shall, during any reporting period, collect as a tax an amount in excess of 2% of his total taxable sales, he shall remit to the Board the full amount of the tax herein imposed, and also such excess;* and *if any vendor* under the pretense of representation of collecting the tax imposed by this Act *shall collect* during any reporting period, an amount *in excess of 2% of his*

*total taxable sales, the retention of such excess* or any part thereof, or the intentional failure to remit punctually to the State Board of Equalization the full amount required to be remitted by the provisions of this Act, *is declared to be unlawful"*,

and a penal clause follows this declaration.

Section 11 of the Act reads in part:

"A tax due and unpaid under this Act shall constitute a debt due the State from the vendor and is hereby made a lien on all the property of the vendor."

We have italicized the above quoted language of the statute which we regard as especially significant. It is to be noted also that in the case at bar the Company elected, under subsection "(e)" of the statute set forth as above, to keep a "detailed segregated record of all" sales of twenty-four cents or less so that we are not now concerned with the payment of "a tax of two per cent on" the Company's "total sales".

Under the facts and law, as above detailed, it is the Company's contention, as we understand it, that the words "total taxable sales" in the italicized portion of section 5, supra, refer both to sales of over twenty-five cents upon which a two per cent tax is imposed and to sales of under twenty-five cents upon which a one per cent tax is laid, and since it, as vendor, has not collected any sum in excess of two per cent of all these sales, both as to those involving a greater price than twenty-four cents and also those involving that price or less no "excess" sum of money under the law is due the Board for the State of Wyoming. In other words, though on sales of more than twenty-four cents the appellant has collected from its customers an excess of money amounting to $1,423.26, over and above the two per cent allowed by the law on sales of this character it need not account to the Board for this excess.

The Board, however, on behalf of the state, through the Attorney General, insists that the Company's position, as outlined above, is not maintainable under a proper construction of the two sections, 4 and 5, of the statute as we have hereinbefore noted its pertinent language.

The Attorney General has directed out attention to the fact that Ch. 102, aforesaid, became effective as law in this jurisdiction April 1, 1937, and that on April 8, 1937, in response to an inquiry from the Board as to the correct interpretation and application of "subsection (e)" supra, of said chapter, the then Attorney General advised the Board as follows:

"The statute imposes two taxes. One is a tax of two per cent upon retail sales of 25c and upwards. The other is a tax of one per cent upon retail sales of 24c or less. The first tax is imposed upon the purchaser. The second tax is imposed upon the vendor or sellers. These taxes are entirely distinct and separate. The vendor has no right to take money paid to him by vendees in satisfaction of taxes which they are required to pay, and apply same to the payment of the tax which he is required to pay. In other words, the vendor is not the owner of the money paid to him by vendees or purchasers in satisfactoin of taxes imposed by paragraphs (a), (b), (c), or (d) of Section 4 of the Sales Tax Act. When that money is paid to any vendor, such vendor holds it for remittance to the State. He has no right to take any part of it and apply it to the payment of his own tax due the State."

This construction of the law which has received the approval of at least two of the chief law officers of the state has been followed by the Board as the department of the state government charged with the duty of administering the Act ever since being thus advised. Says the Attorney General in his brief filed in the case at bar: "during the eight years that this construction has been in force, thousands of dollars have been col-

lected from Wyoming merchants as excess taxes, and no attempt has been made by the legislature to change the law, even though this particular case has been pending for a considerable period of time". This assertion does not appear to be disputed. Four sessions of the legislature of the state have occurred since the construction of the law above announced was transmitted to and followed by the Board and no subsequent statute has been enacted which in any wise interferes with the views thus presented so far as we are informed.

In United States vs. American Trucking Associations, 310 U. S. 534, 60 S. Ct. 1059, 84 L. Ed. 1345, it was held that administrative interpretations of a statute are entitled to great weight where they involve a contemporaneous construction of the law by the persons upon whom rests the responsibility of setting its machinery in motion and of making its parts work effectively and smoothly while they are yet untried and new. See also Norwegian Nitrogen Products Co. vs. United States, 288 U. S. 294, 315, 53 S. Ct. 350, 358, 77 L. Ed. 796. And Mr. Justice Harlan said concisely in United States vs. Philbrick, 120 U. S. 52, 7 S. Ct. 413, 30 L. Ed. 559, that "A contemporaneous construction by the officers upon whom was imposed the duty of executing those statutes is entitled to great weight; and since it is not clear that that construction was erroneous, it ought not now to be overturned." See also State ex rel. Goshen Irr. Dist. vs. Hunt, 49 Wyo. 497, 57 Pac. 2nd. 793; State ex rel. Cross vs. Board of Land Comrs., 50 Wyo. 181, 58 Pac. 2nd. 423.

Where the State Treasurer of Wyoming, whose duty it was and is to superintend the administration of the workmen's compensation fund, obtained from the Attorney General of the state the latter's opinion on the proper construction of a provision of the workmen's compensation law, in Baldwin, State Treasurer vs.

Roby, 54 Wyo. 439, 457-8, 93 Pac. 2nd. 940, this court used this language:

"The state treasurer acquiesced in the foregoing opinion, as will be seen later. Here we have a practical construction by two departments of the state. The legislature did not amend the law on the point here involved, and we must assume that the legislature acquiesced in the construction so made. Lamont v. Intermountain Realty Co., (48 Wyo. 56, 41 P. (2d) 497). The foregoing construction and legislative acquiescence are important herein. (Citing cases). And that is particularly true in view of the fact that the state has undertaken to collect the money out of which compensation is paid. The opinion of the attorney general is directly opposed to the holding of the New York, Indiana, Michigan and Colorado cases above cited, and these cases, accordingly, particularly in view of the legislative acquiescence in that holding, are no authority in this case."

In the case at bar appellant has cited no cases even from other states with similar statutory law holding contrary to the views expressed by the attorneys general and followed by the Board. Of course, if we were convinced that the construction of these administrative officers acquiesced in by the Board as applied to the law before us was clearly wrong we would be obliged to so say, as this court is necessarily the ultimate authority in the construction of state statutes involving no federal question. But we are not so convinced and for many reasons among which may be mentioned the following:

It is apparent that appellant considers it should be entitled to apply the excess collected by it on taxable sales over two per cent thereon upon the payment due from it to the Board because of the one per cent tax. The consequences of allowing this to be done would be to permit the company to violate the law (subsection (e) supra), which specifically states that this one per cent tax "shall be assumed and paid for by the vendor".

In this connection it may be noted also that in addition to what has been above quoted from section 5 of the Act in question, section 17 thereof further declares:

"It shall be unlawful for any vendor to fail or refuse to make any return and payment provided to be made in this Act, or to make any false or fraudulent return or false statement on any return, or to evade the payment of the tax, or any part thereof, imposed by this Act, or for any person to aid or abet another in any attempt to evade the payment of the tax or any part thereof imposed by this Act."

As pointed out by the opinion of the Attorney General, supra, the law as it must be viewed under appellant's conceded election pursuant to subsection "(e)", aforesaid, provides two distinct tax burdens. One of these rested upon and was required to be paid by the purchasers of goods from the Company to the extent of two per cent of the purchase price on all articles priced at twenty-five cents or over. The other rested upon and was required to be paid by the Company. Its amount was fixed and measured by one per cent of the sales below twenty-five cents.

There is no clause in the law which, either by express terms or even by reasonable implication, indicates that the overcollections such as were shown in the case at bar should become the property of the vendor. It is perfectly plain that taxes are only collected from the vendees where the sales of merchandise are for the price of twenty-five cents or over that figure. It is equally clear that an *excess* of *collections* can only arise in the case of taxes collected from the purchasers. From a practical viewpoint the sales of merchandise for twenty-four cents or less merely operate to furnish a basic amount upon which a one per cent exaction is calculated which thus establishes the tax which the vendor is obligated to pay. He, himself, must pay that one per

cent tax just as he does real estate or any other personalty tax imposed upon him by law .

It needs no citation of authority to establish that the courts in construing a sales tax statute should attempt to ascertain and give effect to the intention of the legislature in adopting it and that intention is to be gathered from a consideration not of a single clause, sentence, or section in the Act, but effect must be given, if at all possible, to every word contained in the statute so as to make it harmonious and reasonable in its operation. It follows that in the case at bar sections 4 and 5 of the Act here in question together with the other parts of the law dealing with the matter in hand must be construed together and not separately. Doing that, it is evident that the word "excess" referred to in section 5, supra, designates something *"collected"* by the *vendor as a tax* in "an amount" over "two per cent of his total taxable sales". The words "total taxable sales" when considered in the light of the quoted provision of "subsection (e)" aforesaid includes all sales made at the price of twenty-five cents or more. The vendor collects nothing *as a tax* upon sales of twenty-four cents or less.

The vendor should, we think, not be permitted—unless the statute in clear and positive language so says, and this it is far from doing—to use the money of a vendee who for one reason or another has over-paid the sales tax on a purchased article to offset the failure of such vendor to collect the proper amount from another taxpayer. Neither should such vendor be permitted to use the "excess" thus acquired by him to pay the one per cent tax due the Board because in so doing he would be using not his own money but monies erroneously taken from the vendees in the guise of a state tax to pay his own debt to the commonwealth.

As we see it, if such a course of procedure were to be allowed on the part of vendors it might very well be that the door would be opened to designing or negligent merchandisers to overcharge on sales collected from vendees and not collect on others in order to meet competition from rivals in the same business. That would hardly be fair dealing either with the over-charged customer or with the competing rival.

In appellant's brief we are told the proper rule for computing the amount of tax in dispute in this case should be—"take the tax collected, subtract two per cent of the total taxable sales and if there is a remainder remit to the Board". According to the Agreed Statement of Facts, paragraph "3.(A)", supra, the sales tax *collected* by the appellant totaled $14,871.92. Two per cent of $672,428.97, the total taxable sales (paragraph "3.(A)" aforesaid, construed in the light of subsection (e) supra, as we must construe it) is the sum of $13,448.57. Subtracting this last amount from $14,871.92 results in a remainder of $1,423.35, these figures varying only a few cent from the sum of money ordered by the district court to be paid by the Company to the Board as "excess" collection of sales tax and, accordingly, due the state.

Again, we were told at the argument of this case by counsel for the Company that the crucial question to be answered, shortly stated was: what is the true intent and meaning of the words "total taxable sales" in the clause of the law hereinabove quoted and italicized reading "If any vendor shall, during any reporting period, collect as a tax an amount in excess of 2% of his total taxable sales, he shall remit to the Board the full amount of the tax herein imposed, and also such excess"? It was their view urged upon us in that connection as hereinbefore indicated that those three words should be construed to include both the amount

of sales for twenty-five cents or more and also the amount of sales for twenty-four cents or less. Under the agreed statement of facts as set forth as hereinabove the consequences of adopting the suggested view would appear to be, where the vendor as here has elected to keep the "detailed segregated record" as provided in subsection "(e)", supra, as follows: The stated sales of the Company to its customers of articles for amounts of twenty-five cents or more were $672,428.97; those for twenty-four cents or less were $286,809.30, the total of these two sums being $959,238.27. Two per centum of that total is $19,184.76. The Company collected, as a sales tax on its sales for twenty-five cents or more, the sum of $14,871.92 which, as shown above, was in fact $1,423.35 in excess of two per cent on such sales. One per centum of the sales of articles by the Company for twenty-four cents or less which is imposed by subsection "(e)", supra, as a tax upon the vendor only is the sum of $2,868.09. Adding this last amount to $14,871.- 92 the result is $17,740.01. Subtracting this sum from $19,184.76 produces a remainder of $1,444.75. In other words, the Company could even pay the state both the sum of two per centum collected on its sales of twenty-five cents or more plus the excess of that amount which the state also claims and still the Company would be profiting to the extent of $1,444.75. But the Company, nevertheless, insists that it should retain also the sum of $1,423.35, the excess as above computed. We hardly think it was the intention of the legislature to make it possible for vendors to make such a profit out of tax money taken from the citizens of this state,—in this case to the extent of $2,868.10.

Discriminations of this character in favor of the vendors of articles priced at twenty-four cents or less and who have kept detailed segregated records as provided by subsection "(e)", supra, should not be sanctioned. We may not disregard the plain requirements of that

subsection. Neither of the parties to this litigation have asked that that be done or even suggested such a holding. That the intention of that section is quite clear and explicit is evident from the fact that the legislature definitely said not only that the vendee should not pay any tax on articles sold at twenty-four cents or less but also that the vendor should pay a one per cent tax on such sales unless he elected the other option given in the "in lieu" clause in that subsection. It may be properly observed in this connection that the Wyoming Sales Tax Law appears to be unique in that it requires both vendors and vendees to pay a tax based on sales of tangible personal property. This feature appears both in the 1935 Sales Tax law (Ch. 74, L. of Wyo. 1935) and in the 1937 Sales Tax Act now in force. During the ten years that these two taxation statutes have been in operation no one to our knowledge has ever questioned that phase of the legislation.

In our examination of the authorities which might shed some light upon the problems presented by the case at bar several Ohio cases lately decided have come to our notice. Neither of them were cited by the parties hereto either in their briefs or upon the oral argument had. One of these cases, Winslow-Spacarb, Inc., vs. Evatt, Tax Commr., 144 Ohio St. 471, 59 N. E. 2nd 924, demonstrates very well that the Ohio Sales Tax law is quite unlike our Ch. 102, L. of Wyo. 1937, supra, in its general requirements as to who must pay the tax. The other case, Obert et al., vs. Evatt, Tax Commr., 144 Ohio St. 492, 59 N. E. 2nd 931, we regard as of aid here both in that it considered the effect of a single section of the Ohio Sales Tax Act which somewhat resembles the first sentence in Sec. 9 of Ch. 102, L. of Wyo., 1937, quoted above, and also in that it indicates with reasonable clearness the manner in which the Ohio Court viewed a contention made by counsel in that case similar to that insisted upon by the Company in the case

304

at bar. | The Winslow case was decided February 21, 1945; the Obert case just a week later and on February 28, 1945.

In the Winslow-Spacarb, Inc., case, supra, it appeared that that company sold soft drinks from automatic cup-vending machines at the price of five cents each. No' sales tax was paid by the vendor upon its sales thus made and it neither purchased any sales tax stamps nor cancelled any. The Tax Commissioner, Evatt, assessed a three per centum tax on its undisputed gross sales made during a certain period. This ,was attempted to be done under the authority of § 5546-12a of the General Code which purported to levy an excise tax of three per cent on receipts derived from *all* retail sales with certain described exceptions and less certain credits. However, § 5546-2, General Code, being also a part of the Ohio Sales Tax Act, definitely stated that "if the price is less than nine cents no tax shall be imposed". In order to harmonize these sections and avoid a constitutional objection of non-uniformity of operation upon all persons of the same class the court held that the vendor's gross of five cent sales was not taxable, § 5546-12a being simply an enactment designed to insure approximately the receipt of the tax imposed by § 5546-2 General Code, and did not impose an independent tax.

The Ohio Court, after stressing the express declaration of § 5546-2, quoted above, that no tax should be imposed on sales of articles for less than nine cents and quoting that portion of § 5546-3, General Code, which reads:

"the tax imposed by Section 5546-2 of the General Code shall be paid by the consumer to the vendor in every instance, and it shall be the duty of each vendor to collect from the consumer the full and exact amount of the tax payable in respect to each taxable sale, and to

evidence the payment of the tax in each case by cancelling prepaid tax receipts, equal in face value to the amount thereof * * *."

then remarked:

"It is apparent that while a vendor making taxable sales must supply himself with prepaid tax receipts, thus prepaying the tax into the public treasury, the sales tax is essentially a consumers tax ultimately paid by the consumer."

It has already been made clear herein that the Wyoming Sales Tax law unmistakably imposes its duty to pay a tax both upon the vendor and the vendee. Furthermore, it may be observed that nothing is said in the case just reviewed about the disposition of any excess tax collections made by vendors. It is clear then that this decision has no application to the problems arising in the instant case under a sales tax Act couched in language like ours.

However, relative to the particular contention of the Company here that it may use excess sales tax collections to pay its own tax liability to the state the later case of Obert vs. Evatt, Tax Commr., supra, is quite instructive. In that case the law questions presented to the court were, as the opinion states:

"(1) Where a vendor fails to file a return required by Section 5546-12b, General Code, or fails to remit the proper amount of tax due under Section 5546-12a, General Code, may the Tax Commissioner by virtue of Sections 5546-9a and 5546-12b, General Code, make an assessment against such vendor for retail sales made since January 1, 1937, but more than three years prior to the date as of which the asssessment is made? (2) If so, where does the burden of proof rest to show the amount of a vendor's tax-exempt sales during such period?"

There were before the Tax Commissioner, for making his assessments, statements of the total sales of Obert,

et al., but there was no separation of taxable from non-taxable sales and no separation of taxable from tax-exempt sales.

Says the court:

"Appellants recognize that Section 5546-12a, General Code, is a part of the Sales Tax Act and say in respect of such section:

'We think it is clear that the provisions of Section 5546-12a were not primarily intended as a measure to provide revenue in addition to that contemplated by Section 5546-2, but rather it was intended as a method of securing conscientious observation of the requirements of Section 5546-2 by the vendor.

'That is, if the vendor has collected from purchasers in full for all taxable sales, then the collection there in excess of 3% will, or may, offset the amount of his liability for tax on sales of 8 (sic) cents or under.'

"Appellants fail to give consideration to the requirement of Section 5546-12b, General Code, which provides in part: 'in case any vendor has collected in excess of three per cent of his receipts from sales which are taxable under Section 5546-2 of the General Code as tax from consumers and failed to cancel tax receipts in the proper amount, such excess shall be remitted along with the remittance of the amount of tax due under Section 5546-12a of the General Code'."

It would appear that counsel for appellant in the Obert case, not having before them the very recent decision in the Winslow case, supra, urged that their client might use the collection of sales taxes in excess of three per cent to offset the amount of his liability, under § 5546-12a, for the tax on sales of less than nine cents for which he could get no reimbursement from vendees. It would seem that the court rejected this contention and expressed the view that this could not be done and that the excess should be remitted to the state.

A survey of the facts and law applicable to the case at bar from another viewpoint will further show that the position taken by the Company as above set forth is a mistaken one. If the Company had paid over to the Board all of the sum of $14,871.92 which it is conceded the Company collected from its customers as a sales tax including the excess collection of $1,423.26 which the Board now claims, could the Company recover that excess from the Board, it being the admitted purpose of such recovery that the Company would use the monies thus obtained for its own ends, i. e., to pay its own tax due the state? We think this query should be answered in the negative. And the authorities presently to be cited support the view that under such circumstances the Company could not successfully maintain such a proceeding.

Where an oil company collected a tax imposed by the Motor Fuel Tax Act of 1927 in the State of Illinois (Laws of 1927, p. 758) from customers in addition to the price of motor fuel sold by it, and remitted money and checks for the tax so collected to the Department of Finance in satisfaction of that tax, it appeared that the Motor Fuel Tax Act was thereafter held to be unconstitutional. Suing to restrain the Director of Finance from depositing these collections in the state treasury and also for a return of the money and checks, aforesaid, but without intending to refund the amount recovered to its customers, it was held that the oil company was not entitled to any relief and the Supreme Court of Illinois, in Standard Oil Co. vs. Bollinger, Director of Finance et al., 337 Ill. 353, 169 N. E. 236, said in the course of its opinion:

"During the period in question, the appellee invoked the Motor Fuel Tax Act of 1927 as its authority to collect from its customers 2 cents upon every gallon of motor fuel sold by it. Appellee represented that the additional charge constituted the tax imposed by the

act and was not a part of the price paid for the fuel. The money so collected the appellee remitted to the department of finance in satisfaction of the tax. The appellee acted merely as an intermediary between its customers and the department of finance. It paid the tax, not out of its own funds, but by the collections from its customers for the particular purpose. It now seeks to recover what it has not refunded, and does not intend to refund to its customers. It asks the interposition of a court of equity to recover money which does not belong to it, but it refuses to be governed by equitable considerations. The record fails to disclose any basis for the relief sought. Richardson Lubricating Co. v. Kinney (Indian Refining Co. v. Bollinger), supra. (337 Ill. 122, 168 N. E. 886.)"

The New York Court of Appeals in the case of Re Kesbec, Inc., vs. McGoldrick, City Comptroller, 278 N. Y. 293, 16 N. E. 2nd 288, held that a dealer who had collected from customers ,by reason of an improper interpretation by the municipal authorities of municipal sales tax legislation, an amount in excess of the lawful tax which amount he had been legally required to deposit with the said comptroller in order to obtain a review of the assessment was, by reason of his want of beneficial interest, not entitled to its return and also that he could not keep such excess collection.

The Legislature of the State of Kentucky, enacted a law imposing a tax of seven cents a quart on ice cream which was required to be collected from the person making the first sale thereof in the state and to be accounted for by him to the Department of Revenue. Hughes & Co., after the enactment of this law, sold ice cream in Kentucky and added the tax to the price charged for the product thereby collecting the tax from its vendees and so shifting to them the burden of its imposition. Thereafter the Act was declared unconstitutional as confiscatory. Hughes & Co. sued to recover the amount of the taxes thus collected and paid and in the trial court were allowed to recover. Reversing the

judgment below in this respect and denying the vendor the right to a return of these payment, the Court of Appeals of Kentucky, after remarking concerning the vendor in the event the latter added the tax to its price for the ice cream, "He has never been out any amount, but only became the collector of the tax for the commonwealth and the custodian of the amount of it until the date when he accounted to the commonwealth therefor", further said in Shannon, Auditor, vs. Hughes & Co., 270 Ky. 630, 109 S. W. 2nd, 1174:

"We are of the opinion that, under the circumstances herein outlined, the sellers of ice cream who paid the tax into the state treasury should show that the amounts they seek to recover do not include collections made by them from their customers pursuant to the provisions of section 2 of the act. To hold otherwise would be manifestly unjust and would result in the unjust enrichment of the one seeking to recover the tax from the commonwealth and supported by no outlay on his part. Indirectly it would allow him to take money wrongfully paid into the treasury of the commonwealth by another through himself acting as collector, and leave the actual payer of the tax with a bare cupboard The act does not countenance such a manifest injustice. The appellee should be confined in the amount of its recovery to taxes paid out of its own funds and which it did not collect from any other source."

Section 2 of the Act mentioned by the court permitted the vendor to collect the tax from his customers at the time he made the sale and delivered the taxed article pursuant thereto by adding the amount of the tax to the price of the article if he so desired.

In this connection it is significant that Sec. 424 of the United States Revenue Act of 1928, (U. S. C. A. Title 26, Sec. 424), rendered the right of a taxpayer to a return of certain taxes illegally exacted conditional upon proof, to the satisfaction of the Commissioner of Internal Revenue, that the amount sought to be re-

funded had not been collected directly or indirectly from the purchaser of the articles in respect to which the tax was levied, or, if so collected, had been returned to such purchaser, thus requiring the taxpayer to have assumed the burden of the tax as a condition of his right to claim a refund. This was a declaration of policy by the national lawmaking body and a recognition by it of the principle upon which the above reviewed decisions from New York, Illinois and Kentucky were determined, viz., that a taxpayer may not be allowed a refund of a tax the economic burden of which has been passed to another so as thereby to accomplish for such taxpayer his unjust enrichment. See also 7 U. S. C. A. Sec. 644, Agricultural Adjustment Act.

All things considered, we entertain the view that the judgment of the district court as it involved the question hereinabove considered was correct. So far as the claim of appellant that that part of section 9 of the Act, aforesaid, which reads "It shall be the duty of every person engaging or continuing, in this State, in any business for the transaction of which a license is required under this Act, to keep and preserve for a period of three years at the principal place of business within this State, suitable records of all sales made by him, and such other books or accounts as may be necessary to determine the amount of tax for the collection of which he is liable under the provisions of this Act", constitutes a general statute of limitations which operates to prevent the Board from assessing an additional sales tax for sales transactions during a period which is more than three years prior to the date of the assessment, we also think that the judgment below was correct in denying the validity of such a contention. We can hardly read into the law such an interpretation when it says nothing whatever about limiting the power of the Board to make assessments after the lapse

of three years. Appellant cites no cases in support of its contention that such language should be so construed. It may be that in certain cases, where the Board is obliged to rely solely upon the vendor's records to make the proper assessment, from a practical standpoint it would be difficult and perhaps impossible to impose a tax after three years with no records available but we have no such situation presented here.

Recurring once more to the Obert case, supra, and recalling the legal questions therein involved, it appeared also that § 5546-12 of the General Code and a part of the Ohio Sales Tax Act provided:

"Each vendor shall keep complete and accurate records of sales of taxable property, together with a record of the tax collected thereon, which shall in every instance be the amount due under the provisions of this act, and shall keep all invoices, bills of lading, retained parts of cancelled prepaid tax receipts and such other pertinent documents, in such form as the commission (commissioner) may by regulation require. Such records and other documents shall be open at any time, during business hours, to the inspection of the commission (commissioner) and shall be preserved for a period of three years, unless the commission (commissioner) shall, in writing, consent to their destruction within that period or by order require that they be kept longer."

It was also the fact that no order had been made requiring that the records in that case needed should be kept longer than the prescribed statutory period of three years.

It was contended that the Tax Commissioner was estopped from making an assessment for sales made during the prior period when the vendors were not required to maintain their records. But the court said:

"We are of the opinion that the Tax Commissioner is not estopped from making an assessment according to Section 5546-12a, General Code, on account of sales

made during a period prior to the three-year period even where the Tax Commissioner has failed to issue an order requiring vendors to keep their sales records for a period longer than three years."

It was held as stated in the syllabus prepared by the court itself and appended to its opinion that:

"Where the amount of vendor's gross receipts from sales are known, the burden rests upon such vendor to show what part, if any, of such receipts resulted from sales of tax-exempt merchandise.

"There is no limitation of time within which an assessment may be made under Section 5546-9a, General Code, for failure to remit the proper amount of tax due under Section 5546-12a, General Code."

The judgment of the district court of Laramie County being in harmony with the views hereinabove expressed it should, accordingly, be affirmed.

*Affirmed.*

KIMBALL, J., concurs.

BLUME, Chief Justice, Dissenting.

This is an appeal from the judgment of the District Court of Laramie County, sustaining an additional assessment made by the State Board of Equalization on September 23, 1942, in the amount of $3661.91, against the Walgreen Company, a drug company, doing a retail business in this State, appellant herein, for use and sales taxes, and penalties and interest thereon. The point of the use tax is not in controversy. The case was submitted to the Court upon stipulation of facts from which it appears that from January 1, 1939 to July 31, 1942, the period in controversy herein, the appellant made sales in amounts of 25c or more, totalling $672,-428.97, on which it collected sales taxes in the sum of $14,871.92. The appellant, during the same time, made sales to customers in amounts of 24c or less, totalling

$286,809.30, upon which no sales taxes were collected from the customers by the appellant. The question herein is as to the amount due for taxes on these items so sold. The Court, confirming the order of the State Board of Equalization, held that the taxes due are the total amount of taxes collected as above mentioned in the sum of $14,871.92 and 1% on $286,809.30, on items sold for 24c or less, namely a tax of $2,868.09, making a total of $17,740.00. The appellant, not contending that it does not owe the item of $2,868.09 on items sold for 25c or less, claims that it should not in addition thereto pay the total amount of $14,871.92 collected on items sold for 25c or more, but should pay, as such addition, only 2% on $672,428.97, the total sales on which a tax was collected; 2% of this amount would make a tax of $13,448.58. The difference between $14,871.92 and $13,448.58 is the sum of $1423.34, and is the amount in controversy herein. It is the amount collected in excess of 2% on items sold for 25c or more, and appellant claims that this so-called excess amount belongs to it or can be used to offset the tax on items sold for 24c or less, and that the penalties and interest should, of course, be adjusted accordingly. The State Board of Equalization, on the other hand, claims that the foregoing so-called excess of $1423.34 all belongs to the State; that appellant also owes 1% tax on $286,-809.30, on which no tax was collected from the consumers. In other words, the claim is that this 1% tax has nothing whatever to do with the sales tax, but is an independent tax assessed against the sales of less than 25c, and that the state owns the so-called excess on sales of over 25c, and cannot be used to offset the tax levy of 1%. The principle involved in this case is vital, goes to the very foundation of the nature of the sales tax, and even deeper, since it involves the question as to what independent taxes, discriminatory in their nature, as hereinafter pointed out, can be levied.

The sales tax was imposed by Chapter 102, Session Laws of 1937, and Sec. 4 of that Act provides in part that there shall be collected and paid:

"(a) An excise tax upon every retail sale of tangible personal property made within the State of Wyoming equivalent to two percent. (2%), except as provided in sub-section (e) of this Act, of the purchase price paid · or charged", etc.

Sub-section (e) of the Act provides:

"The State Board of Equalization shall provide uniform methods and schedules for adding the tax or the average equivalent thereof to the selling price, and when added such tax shall constitute a part of such price or charge, shall be a debt from consumer or user to retailer until paid, and shall be recoverable at law in the same manner as other debts, and it shall be the duty of said Board to formulate and promulgate appropriate rules and regulations to effectuate the purpose of this Act; provided, that the tax on all sales of twenty-four (24c) cents or less shall be one percent, and provided further, that the purchaser, consumer and user of any single unit purchase of twenty-four (24c) cents or less, shall not be required to pay the tax provided herein and provided further that the tax of one percent herein imposed on all purchases of twenty-four .(24c) cents or less shall be assumed and paid for by the vendor who shall keep a detailed segregated record of all such sales. Any vendor who shall so elect may, in lieu of keeping such detailed segregated record, pay a tax of two percent. on his total sales upon which the tax provided herein is imposed".

It is as plain as words can make it that under the foregoing provisions a retailer who elects to keep a separate account of the items of sale of 24c and under, as appellant did, is liable for a tax of 2% of the sales of 25c and more, and for a tax of 1% on the minor items sold. It does not say that he is liable for more than that. It mentions no excess; it does not provide that if a retailer collects more than 2% on the larger items he

must pay that excess to the State. It was, in the opinion of the writer, if lawfully collected, evidently intended as hereafter shown to offset, as far as it would the tax of 1%, which is to be paid by the retailer on items sold for 24c or less. We have no basis before us to say that the tax was not honestly collected. It is at least possible under the brackets of the sales tax fixed by the State Board of Equalization that the money was collected honestly. It depends entirely on the number of sales made within the brackets in which more than 2% is collected. Suppose, for instance, that one half of the approximately $672,000 or $336,000 sales above mentioned, were made for 30c each. That would make 3 and 1/3 cents for every dollar of the $336,000. The total tax then that would be lawfully collectible on these sales would be $11,200.00. If the half of these sales— $336,000—were each made at 75c that would make 2 and 2/3 cent for each dollar of the sales or $8,960.00. Thus there would have been lawfully collectible on the total sales of $672,000 a tax of $20,160.00, instead of the tax of $14,871.92 actually collected. If half of the sales had been made at 40c each, appellant would have been able to lawfully collect a total tax of $17,360.00, or sufficient to pay all of its taxes. Similar results may be arrived at by taking other figures. While these figures may seem to lead us far afield from the questions involved herein, they throw, in fact, light on what hereafter will be stated. The actual amount collected fell short by some $1400 of what the legislature intended should have been collected, as hereafter more fully shown. That was due to the amounts of the individual sales and the brackets fixed by the State Board of Equalization. As a matter of fact, the legislature contemplated that the merchant might collect more than the total of his taxes as clearly appears from the provisions of section 5 of the sales tax statute hereinafter more fully considered.

## I. NATURE AND CHARACTERISTICS OF OUR SALES TAX.

I shall return to the direct statutory provisions bearing on the foregoing point—as to whether the so-called excess belongs to the State—and discuss it more fully at the end of this opinion. At present, in view of the fact that it is claimed that the 1% tax above mentioned is an independent tax and that it has nothing to do with the sales taxes to be ultimately paid by the consumer, we should, in order to get a comprehensive view of the subject, and to understand the situation once for all, to examine that point, and that involves the nature and characteristics of our sales tax. Was it the intention of the legislature that *on the average* the whole of the tax was ultimately to be borne by the consumers, or was it not? The point has a direct bearing on the question herein involved, for if the intention was as mentioned, it follows, of course, that if a so-called excess was collected on the sales which bear a tax of 2%, that amount may, so far as it will, be applied on the 1% tax, with the exception hereinafter mentioned, which does not apply in this case. And in that case there is no merit in the claim of the State. It has always been my understanding, and it is now, that the legislature intended that the sales taxes should all be ultimately borne by the consumers, so far as possible. I believe that the various provisions of our statutes unerringly point to that conclusion.

The gasoline tax in this State has always been ultimately paid by the consumer. Signs have been prominently displayed at every gasoline station what the amount of the tax is. The payment thereof by the consumer was inferentially at least sanctioned by the legislature of this State since 1925. See Sec. 115-1109, Rev. St. 1931. Thus a policy that the consumer should ultimately bear the burden of a sales tax was inaugurated

in this State more than twenty years ago. That is the policy in connection with sales taxes in all the states which have a sales tax similar to our own. That is true at least in a number of states, as in Colorado, Utah, California, Alabama, Arkansas, Iowa, Ohio, North Carolina and West Virginia. Notable evidence thereof is the present sales tax law of Colorado, which continued that policy after a number of years of experience, in the amendment adopted as late as 1945. Under it no tax is now paid or collected on sales under 19c. In some states tokens are used, so as not to make the tax too burdensome on the consumer, and at the same time permit the merchant to recoup the tax from the former. Our sales tax was to a large extent taken from Utah, pursuant to the recommendation of the then Governor in his message to the legislature in 1935. But we did not adopt all the features thereof. Instead of using tokens, a different system was adopted, but which on the whole was unquestionably intended to arrive at the same result. Sec. 4 (e), Chapter 74, Session Laws of 1935, the predecessor of the Sales Tax Act of 1937, provided that "the State Board of Equalization shall provide uniform methods and schedules for adding the tax or *the average equivalent* thereof to the selling price", etc. (Italics supplied). Sec. 4 (e) of the Sales Tax Act of 1937, already quoted, contains the identical language. These provisions cannot be ignored, and must be borne in mind throughout. According to the rules and regulations of the State Board of Equalization no tax is paid by the consumer if his purchase is 24c or less. It is 1c if the purchase is between 25c and 74c, and 2c if between 74c and $1.25, and 2% if the purchase is above that amount. Thus the consumer sometimes pays more than 2% ; sometimes less. The average is sought to be 2% on all purchases except as specifically otherwise provided in the law. The nature of these provisions is the same. In one case—in connection with

sales of 24c and under—the legislature itself made specific provisions; it left other cases to be provided for by the State Board of Equalization, but all were aimed at one definite goal, to reach an average so that the tax should ultimately be fastened upon the consumer, and if the proper average in some cases is not attained that is either the intention or the fault or a miscalculation on the part of the legislature or the State Board of Equalization, or both. There is no sound reason for characterizing the 1% tax as of a different nature than the 2% tax. It, through the method of arriving at an average, was intended to be ultimately paid by the consumer the same as the other. Take for instance, sales between 50c and 74c, the tax paid by the consumer is less than 2%; on sales of 74c the tax paid by the consumer is 1.48%. Like facts are true of sales from $1.00 to $1.25. But the retailer is compelled to assume and pay the difference in exactly the same manner as he is compelled to assume and pay the 1% tax mentioned in the law. Neither is an independent tax. The difference is one of degree, not of kind. In one case the legislature has definitely fixed the amount; in the other it has done so through regulations made by the State Board of Equalization.

Contemporary construction makes the foregoing perfectly plain. Under the Sales Tax Law of 1935, Sec. 4, the consumers did not pay a tax on sales of 13c and under, but the merchant paid a tax of 2% thereon as well as on other sales. The State Board of Equalization, as then composed, in its Ninth Biennial Report, duly published, stated as follows:

"Some complaint has been heard because sales tax tokens were not issued to provide for payment of the tax on purchases under $1.00. As the law did not directly provide for the issuance of tokens, and because sales under 13c were exempted, and the rate of the tax being two percent, the Board has attempted—Section

4 (e)—to provide 'uniform methods and schedules for adding the tax or the average equivalent thereof to the selling price,' by issuing its bracket for collection of the tax at the rate of one cent on sales of 14c to 64c, and two cents on sales from 65c to $1.25, with the rate of two percent on all sales above $1.25, governed by major fractions of ½ cent or over. *Collections indicate that an average rate of two percent is being paid when all sales are taken into consideration.* If token collection is desired, the legislature should so provide. In this connection, it is estimated that token costs will range from $5,000 to $10,000, the general method of distribution being to issue same at face value to the retailer who, in turn, issues them to the customer". (Italics supplied).

The Honorable Leslie A. Miller, then Governor of Wyoming, in his message to the legislature in 1937, stated as follows:

"Some complaint has been heard because, under our system, sales tax collections on purchases under $1.00 amount to more than 2% and the use of tokens has been advocated. Our law did not provide for the issuance of tokens. Taking notice of the provisions whereby sales under 13c were exempted and the rate of tax being fixed at 2%, the Board of Equalization has attempted, to use their words, to provide 'uniform methods and schedules for adding the tax, or the average equivalent thereof, to the selling price'. By providing brackets for collection of the tax at the rate of 1c on sales of 14c to 64 c, 2c on sales from 65c to $1.25 and a rate of 2% on all sales above $1.25, collections indicate that *an average rate of 2% is being paid when all sales are taken into consideration.* The use of tokens is a very great annoyance to clerks and merchants, but if a flat payment of 2% on every sale is desired, the legislature should provide for a form of tokens. For your information, it is estimated that token costs will range from $5,000 to $10,000, the general method of distribution being to issue same at face value to the retailer who in turn issues them to the customer". (Italics supplied). Thus these men, eminently qualified to speak on the subject, and interested at that time perhaps more than

any one else, did not believe that the tax on sales under 14c was an independent tax. They clearly thought that on the average the whole of the tax was being borne ultimately by the consumers. And they evidently thought that proper, and in accordance with the intention of the legislature, or they would have expressed themselves differently. That was in connection with the 1935 law. The arrangement in the 1937 law is no different in principle. It moved up the bracket of nontaxable sales to the consumer from 13c to 24c, and then assessed a tax of 1% against the merchant on sales under 24c. The reason for the 1% tax is perfectly clear. If, as stated by the Governor in the message aforesaid, and by the State Board of Equalization in its report above mentioned, the merchant collected approximately 2% on all of the sales, then, moving the bracket of nontaxable sales to the consumer from 13c to 14c, might not enable the merchant to collect all of the taxes from the consumer; to raise it up to 15c the likelihood of that would be greater; to raise it up to 16c the likelihood would still be greater, and raising it up to 24c would make it practically a certainty that the merchant would not be able to collect all of his taxes from the consumer, and in order to avoid that fact, the legislature, instead of assessing 2% on these smaller sales assessed a levy of only 1%, so as to make it likely that under that arrangement, and the bracket fixed by the State Board of Equalization, all of the taxes would, on the average, ultimately be paid by the consumer.

Further proof, and rather persuasive, that the consumers are intended on the average to pay the sales taxes, and that the 1% tax above mentioned is not an independent tax on the retailer, wholly disassociated from the tax to be ultimately paid by the consumer, is furnished by the law on use taxes. The use tax is complementary of the sales tax. The statutes providing for both taxes were passed at the same session of the

legislature and should be construed together. Winter vs. Barrett, 352 Ill. 441, 186 N. E. 113, 89 A. L. R. 1398. It would not make good sense to make the consumer pay all of the use taxes and hold that a contrary intention is shown in connection with the sales taxes, when the laws as stated before, levying both taxes were passed by the same session of the legislature. There is scarcely any doubt that the whole of the use tax is paid by the consumer, as clearly appears from Sec. 3 and 6 of the Use Tax Act, Chapter 118, Session Laws of 1937. An additional proof of what has been said and equally persuasive is found in the provision in Sec. 5 of the Act—again referred to hereafter—which in fact dissipates whatever doubt there might be on the subject. It contemplates that notwithstanding the fact that the consumer does not pay anything on the smaller sales—true under the 1935 and 1937 laws—the merchant may nevertheless be able to collect *more than 2%* of all his sales; that is to say, more than all the taxes which the merchant must pay to the state, and the state appropriates the excess amount, if that is done, but nothing more. It follows, of course, that the statute contemplates that the merchant may be able to collect at *least 2%* of all the sales which he makes, and since this statutory provision permits the merchants to keep the amount collected from the consumer up to the 2%, it follows as the night follows day that the statute contemplates that he may use the amount so collected to pay all the taxes assessed against him, and so the claim of an independent tax goes out of the window.

Thus not only the various provisions of our statutes, but also the contemporaneous construction of the men most competent to speak on the subject clearly show that no independent tax was intended to be levied on some of the merchants, but that *on the average* the consumers should, as nearly as possible, with the aid of various brackets to be fixed by the State Board of

Equalization, ultimately bear the burden thereof, thus harmonizing the intent of our statutes with that of the statutes of numerous other states, instead of having our system stand out as a maverick among the many. Under that construction and that only can our statutes be upheld as valid. Whether the intent has been carried out is a point which I shall refer to later.

## II. CONSTITUTIONALITY OF AN INDEPENDENT TAX.

In contrast to the foregoing construction of the statute, counsel for the respondent herein construe it to mean that the legislature levied a separate and independent tax of 1%, wholly disassociated from the sales tax which is ultimately to be borne by the consumer. In other words, they claim that the legislature tapped a new and theretofore unused source of revenue. If that were so, there would arise at once a serious constitutional objection on the ground of the want of uniformity, and the absence of a rational basis for classification. It is difficult to conceive of any valid reason why a merchant selling goods for 25c and more should be able to collect the tax from the consumer while the merchant selling goods for 24c and under should be prohibited from doing so. That would constitute an intolerable discrimination. "Courts have repeatedly held that to be valid, taxation and other statutes must operate equally upon all persons of the same class; no discrimination or favoritism among them is permitted". Winslow-Spacarb, Inc. vs. Evatt, 144 Ohio State 471, 59 N. E. 2d 924, 926. True the statute relates to all merchants whoever may sell goods for 24c and under, but that does not solve the difficulty. We all know that some merchants sell few, if any, articles of merchandise for 24c or less; others sell many of these. It is perfectly clear that the latter would be much more heavily burdened than others, and a great discrimina-

tion would exist against them, if the statute were to be construed as it is construed by counsel for the respondent. Go into a jewelry store, a hardware store, a clothing store, a shop for women's wares, and perhaps others, and we find no articles that sell for less than 25c, or such articles nowadays are so scarce as to be hardly perceptible. These merchants are, under the law, able to recoup the sales taxes from the consumers. Why should it be otherwise with, and a vicious discrimination exist against, those who sell us the small articles of value, many of which we all want and need?

A case in point herein is the foregoing case of Winslow-Spacarb, Inc., vs. Evatt, 144 Ohio State 471, 59 N. E. 2d 924, decided in February, 1945, construing the Ohio Sales Tax law. By Sec. 5546, Ohio Code Ann. 1940, the legislature levied an excise tax on sales as follows: 1c if the price is 40c or less; 2c if the price is from 41-70c; 3c if the price is between 71-100c. "If the price is less than 9c no tax shall be imposed". Subsequently, the legislature, by Sec. 5546-12a, passed an excise tax of 3% on all sales, but giving credit for the tax paid under Sec. 5546, supra. That, on the face of the statute, meant that those selling for 9c and less were assessed with an independent tax of 3% without being able to recoup the tax from the consumer, though others were able to do so, just as in the case at bar, it is contended by counsel for respondent that those selling for 24c and less have been assessed with an independent tax of 1% without being able to recoup such tax from the consumer though others are able to do so. The parallel is obvious. The case is squarely in point. The Ohio Supreme Court, holding the tax assessed against a party selling for 9c and less to be invalid struck down the evident intent of the statute, giving it a meaning to avoid such injustice, and holding that it would otherwise create an unfair and unconstitutional discrimination. The court further held that the statute

was designed to insure the state of the receipt of taxes levied under Sec. 5546-2; that it was not designed to levy an independent tax but that the statutes as a whole were designed to secure to the state an average of 3%. The courts stated in part:

"(1)   In the opinion of this court, Section 5546-12a, General Code, in its original form and as it now exists, is designed primarily to insure to the state the receipt of the excise tax levied by Section 5546-2, General Code, and does not impose an independent tax, despite some language which might convey that impression.

"(2)   It is always the duty of a court to construe a statute, if possible, in a manner to give it a constitutional operation. In accordance with such rule, Section 5546-12a, General Code, should be interpreted as excluding a vendor wholly engaged in the making of separate sales of a commodity at a price less than nine cents per unit, such sales not being taxable under the express terms of Section 5546-2, General Code. If Section 5546-12a were to be applied to such a vendor who collects no tax from the consumer, the vendor would be paying three per cent on his gross retail sales entirely out of his own pocket, while other vendors in the same vicinity selling similar and other commodities, some of their sales being taxable and others not, would have the privilege and advantage of deducting 'the amount of tax paid to the state by means of cancelling prepaid tax receipts,' for which expenditure they have been reimbursed by the consumer, thus placing them in a more favored position and in some instances, at least, causing them to pay little or nothing. The result would be an unfair discrimination among vendors, in violation of the equal protection clauses of Section 2, Article I of the Constitution of Ohio and the 14th Amendment to the Constitution of the United States.

"(3)   Courts have repeatedly held that to be valid, taxation and other statutes must operate equally upon all persons of the same class; no discrimination or favoritism among them is permitted. This rule includes excise taxes. See 51 American Jurisprudence, 212, Section 159".

The majority say that the case is not in point because under the Wyoming law the duty to pay a tax is imposed upon the vendor and vendee. That is an assumption. And that is the very thing that the Ohio Amendment sought to do, and the very reason why the Ohio Supreme Court held the amendment seeking to do that to be unconstitutional. The case is so clearly in point that I cannot perceive that the majority can so easily brush aside a case from a court which up to now has been held in high esteem by us. The case of Obert vs. Evatt, 144 Ohio St. 492, 59 N. E. 2d 931, does not deal with the point here discussed, but with the point as to whether or not an assessment may be made after three years.

Another thing should be added here. In view of the fact that the persons selling goods for 25c and over are able to recoup their tax from the consumers, then, if the persons selling for 24c and under are not permitted to charge that tax, the result is, in substance, that the latter are taxed, and the former are not. That this is an unconstitutional discrimination is held in Winter vs. Barrett, 352 Ill. 411, although the reasoning of the court in that case is based on somewhat different ground than that applicable in the case at bar. The fact that the merchant is not forbidden to add the equivalent of the tax to the price of his goods, does not take away the odium of discrimination. Some may be able to do so and some not. The subject of incidence and shifting of taxation is an intricate one on which few persons are able to speak with authority. It is easy enough for one without experience in the mercantile field, to show theoretically that any tax, unless too outrageous, can be easily shifted, and that hence there is no harm in discrimination. The thousands, in fact innumerable wrecks in the mercantile field, bid us to be cautious in drawing any such conclusion and exhort us to take account of the facts of life. It is far safer to obey the con-

stitutional mandates against discrimination. The privilege extended to collect the tax from the consumer as a tax should, if it extends to some, be extended to all. To extend special privileges is and always has been considered odious in our republic. Equal opportunity, equal privileges alone can give confidence to the public and the feeling of security to the merchants. That equal privilege does not always take the same form. It may exist in the case at bar by permitting appellant and others situated like it, to pay all the taxes so far as they may, out of the taxes collected from the consumers, the same as others are permitted to do.

The legislature of the State did not, in my judgment, intend to discriminate, in fixing a tax of 1% on sales of 24c and under; it attempted, and I think, deliberately and in a spirit of fairness, to avoid any discrimination, believing that the State Board of Equalization could so arrange the brackets, directed to be fixed by it, in such a way so as to effect non-discrimination. Whether the aim has been accomplished or not, may, doubtless, be easily ascertained from the reports sent to the State Board of Equalization, and if it has not been accomplished, as seems to be true, the fault may, perhaps, be corrected by rearranging the various brackets. The legislature did not, of course, intend that the brackets to be fixed by the Board should forever remain the same if they should be found not to accomplish the ultimate aim of the statute. Matters of this kind can be corrected only by trial and error. The brackets first fixed were intended to be tentative to be corrected as experience should demonstrate to be necessary. In the case at bar the appellant by paying 2% on the larger sales will pay $13,448.58 and by paying 1% on the sales of 24c and under will pay $2,868.09, a total tax of $16,316.67, while it collected only $14,871.92, a difference of $1,444.75. By adding the $1423.34, involved in this case, as the majority of the court is doing, appellant will pay

$2,868.09 more than it collected. While in matters of taxation, exact justice cannot be expected, justice in the rough is possible, and the foregoing difference of $1,444.75 and $1,423.34, unjustly paid or to be paid by appellant herein, is too large an amount to even come within the term "justice in the rough".

I have called attention to the nature of the sales tax and the features of constitutionality because these points naturally press themselves upon our attention when the argument is advanced that the tax in controversy here is an independent tax, wholly disassociated from the tax to be ultimately borne by the consumers. If what has been said above is correct, that in itself, without more, clearly shows that all the tax rightfully collected by the appellant herein from the consumers was intended to be used to pay all of the tax assessable against the appellant. As a matter of fact, the provisions of the law, as hereafter more fully discussed, and aside from the conclusions heretofore drawn, clearly demonstrate the injustice of the judgment herein. It should not have been necessary to enter into the foregoing discussion, and I should not have done so, except to show more clearly—though that is hardly possible as will appear from what is stated hereafter—the error of my associates. And if the foregoing discussion has accomplished nothing else except to call closer attention to the historical facts of our sales tax law, and to its fundamental aims, it will have subserved its purposes, and I shall be satisfied, leaving it in the hands of future legislatures to display that fairness and justice which, on the whole, they have so eminently displayed in the past.

## III. NO EXCESS COLLECTION DUE THE STATE.

Whether my statement as to the characteristics of our sales tax are true or false, cannot change the result that should be reached in this case, as will appear pre-

sently. The majority of this court have succeeded admirably — though I did not think that possible — in handing down an opinion which on its face appears to be basically just. As a matter of fact, a careful reading of the facts and the two brief statutory provisions applicable herein will, in my judgment, prove the conclusions reached by the majority to be completely erroneous. Before proceeding to discuss the main points involved, two minor points seem necessary to be noticed, in order that those who possibly happen to read this dissenting opinion along with the majority opinion may consider the main points freed from any preconceived judgment. Part of the majority opinion, after giving certain computations and referring to the theory of appellant herein, contains this statement: "In other words, the company could even pay the state both the sum of two per centum collected on its sales of twenty-five cents or more plus the excess of that amount which the state also claims, and still the company would be profiting to the extent of $1444.75. But the company nevertheless insists that it should retain also the sum of $1423.35, the excess as thus computed. We hardly think it was the intention of the legislature to make it possible for vendors to make such a profit out of tax money taken from the citizens of this state—in this case to the extent of $2868.10".

It is hard for me to believe that the court means what this statement seems to mean and conveys to the ordinary mind. Putting and portraying the figures as above makes the opinion appear as a righteous one. Figures, they say, do not lie, but the inference drawn therefrom, and from the manner of their presentation, are sometimes terribly wrong. I never before heard that a loss, or a forced payment out of one's own pocket, constitutes a profit. Whether it was intentional or otherwise, the foregoing statement, particularly when the opinion is read as a whole, leaves with the reader, or at least with

me, the impression of dishonesty and grasping conduct on the part of the appellant. That is in no manner justified by anything in the record before us. I cannot think that this case should be decided upon the theory, not warranted by the record, that the appellant has been dishonest or grasping, and that hence the court must find some means to compel the appellant to disgorge its ill-gotten gain. If the company paid 2% on its sales of 25c and over, that is to say $13,448.58, plus the amount the State claims, ($1423.34), it would pay exactly the amount it collected as a tax. There would be no profit or loss—a profit of $1444.75 or any other sum in such case is a mathematical impossibility. The simple facts are, as twice heretofore stated, that the company's 2% tax on its larger sales is $13,448.58; its 1% tax on the smaller sales is $2,868.09, a total of $16,316.67. It is willing to pay that. It collected only $14,871.92. In other words it collected $1,444.75 less than its 2% and 1% taxes, and is compelled to pay that out of its own pocket. Just by what legerdemain that can be said to be a profit of $1,444.75 is something that needs better explanation, and how that is increased to $2,868.10 is beyond my comprehension. If appellant is not compelled to pay the $1,423.34, its loss will still be $1,444.-75. If it is compelled to pay it, its *loss* not profit will be $2,868.10. The majority seemingly bases its computation on a tax liability of appellant of $19,184.76. If so, that, of course, is utterly wrong, and I can see no justification for its use in connection with the statement above quoted.

I pause here to refer to the question propounded by the majority opinion, namely as to whether or not the appellant could recover the $1,423.34, if it had already paid it. Though the point has no bearing in this case I might say that if the appellant had paid it under protest, and nothing further appeared in the record, I should answer the question by an emphatic yes. The

court cites cases from Illinois, New York and Kentucky. These cases seem to be decided on the theory that the tax payers unlawfully or dishonestly collected money sought to be recovered. There is not the slightest evidence in the record before us that indicates that to be true here. Hence the foregoing cases and the discussions in connection are wholly immaterial herein.

No basis of any kind, except the fiat of the court, justifies the holding that the appellant owes anything to the State. Our statutes are clear and decisive on that point. Under Sec. 4 (e) of the Sales Tax Law, heretofore quoted in full, the legislature imposed upon the retailer the duty to pay to the State a tax of 2% on all sales of 25c or over, and a tax of 1% on the minor sales. Nothing more. There is no hint or intimation in that provision that any excess of collections over and above that 2% on the larger sales should go to the State. If the excess has been collected lawfully (which I think it was) it is the property of the seller; if unlawfully it belongs to those who paid it. Neither under the provisions of the statutes heretofore quoted nor under any principle of law has the respondent any right or claim thereto, provided, of course, the appellant pays the tax due from it. That is elementary and it should not be necessary to cite the rule of law mentioned in 47 Am. Jur. 216, Sec. 14 that sales tax statutes should be strictly construed.

We now come to the provision of Sec. 5 of the Sales Tax statute which is claimed to have a bearing herein. That provision reads as follows: "If any vendor shall, during any reporting period, collect as a tax an amount in excess of 2% of his total taxable sales, he shall remit to the Board the full amount of the tax herein imposed, and also such excess". Simplified, the provision is that if a merchant collects more than 2% of all his taxable sales, he must pay the excess to the State. If he collects

only to the extent of 2%, he pays no excess. This provision was copied verbatim from the 1935 Sales Tax Law. It was intended that the merchants should serve as compulsory agents of the State to collect the tax without receiving any compensation for that service. The uniform tax under the 1935 law was 2%. That was changed in the 1937 law to 2% and 1% as already shown. And if the attention of the legislature had been called to it, it might have modified this provision to the effect that if the retailers should collect more than the 2% and 1% fixed by the law, the excess should be paid to the State. That would not have made one iota of difference in this case, since the amount collected by appellant fell short of that amount by more than $1400.00. The provision was not changed, and we must take it as find it. It is as plain, as clear, as unequivocal as the English language can make it. There cannot be the silghtest doubt as to its meaning. It does not require any one educated in the law to read it and understand it perfectly. The term "taxable" was doubtless inserted in this place for the reason that not all sales are taxable. Some sales are specifically exempted under Sec. 2 of the Sales Tax Act. But in the case under Sec. 4 of the Act all sales made by the appellant herein are taxable, some at 2%, others at 1%. That is clear. Hence it is also perfectly clear that the excess under the foregoing provision consists of an amount over and above the 2% *of the total sales*. The tax of 2% on the total of the sales made by the appellant herein would amount to $19,184.76, while the appellant collected only $14,871.92. Hence there is no excess within the meaning of the foregoing provision which is taxable to the appellant. Counsel for the respondent would read that provision as follows: "If any vendor shall, during any reporting period, collect as a tax an amount in excess of two percent of his total taxable sales *over twenty-five cents or more,* he shall remit to the Board the full

amount of the tax herein imposed, and also such excess". The words in italics do not appear in the law and courts do not have the right to insert them. Without these words inserted, no basis for liability herein can be found. The majority of the court, calling it interpretation, in effect say that the provision should be read with that interpolation inserted. It is said that this is warranted in the light of Sec. 4 (e). No other explanation is made. Sec. 4 (e) does not make appellant liable for any excess. It makes it liable only for a 2% and a 1% tax which it is willing to pay. I can conceive of no possible reason why on account of that provision the provision of Sec. 5 should be changed and mutilated, and a new factor of additional liability be introduced thereby. Two different legislatures enacted the latter provision. The 1937 statute, in connection with the point here considered, differs from the 1935 statute only in raising the bracket in which no tax is exacted from the consumer from 13c to 24c. Under the 1935 law the merchant paid 2% tax on sales under 14c without collecting it from the consumer, just as the merchant pays the 1% tax under the 1937 statute without collecting it from the consumer. Hence if the interpretation now put upon the foregoing provision has any sound basis, the legislature of 1935 necessarily meant that 2% in excess *of the total sales over 14c or more* should be paid to the State. It enacted no such provision. So an ignorance is attributed to two different legislatures of which they were not guilty. I am unable to see that to sanction the foregoing interpolation under the guise of interpretation is anything else than an arbitrary mutilation of a plain statutory provision, or anything else than the purest kind of judicial legislation and usurpation. I venture to assert that no appellate court during the many centuries of Anglo-American jurisprudence has ever before gone half that length.

It is correct that the provision of Sec. 5, supra, designates something collected by the vendor as a tax. It is also correct that the vendor collects nothing as a tax on sales of 24c and under. Hence it necessarily follows that the tax collected by the vendor, as contemplated by that provision, comes from sales of 25c and more. It is that tax, collected from that source, which belongs to the State only if, and only to the extent of the amount in excess of 2% of the total sales. If the provision of Sec. 5 is relied on as a source of liability of the appellant—and there is none other—the provision should be accepted as it stands without multilation. I may be pardoned at this point to again call attention to the fact that, since the legislature has given to the State a claim to nothing more than the excess above mentioned, it necessarily has left the remainder of the tax collected to the merchants, and that conclusively shows that all the money collected, not in excess of 2% of the sales, may be used, as far as it will, to pay all the taxes due from the merchants, and so, as stated before, the theory of an independent tax "goes out of the window".

The majority opinion is partially based on the construction put on the law by a former Attorney General. It is, of course, not surprising that that official, without the benefit of arguments on both sides, and frequently under the press of business and without the time to deliberate as has this court, should occasionally send out an erroneous opinion. Correct or erroneous the duty of this court to form an independent judgment is not lessened. It is stated that the construction put upon the statute as above menioned "has received the approval of at least two of the chief law officers of the state". I presume that one of these is the present Attorney General, since we know nothing of any other in this connection except him and the Attorney General in 1937. So, if I understand the majority opinion, we

have come to the point apparently where the opinion of the Attorney General expressed in a case in this court is given greater .weight than the opinion of opposing counsel, merely because of the position as Attorney General. Credence is given to the statement in the brief of the Attorney General, without the slightest support in the record, that thousands of dollars have been collected under the construction put upon the law as above mentioned. Even if that be true, just because thousands of dollars have been unjustly collected from others is no justification for carrying the injustice further, but should be an incentive to stop it as promptly as possible. Surely that should not become part of the prop to sustain an opinion of the court.

The construction above mentioned was adopted in 1937. It was attacked in 1942, and I am assuming that the court would not decide against a litigant merely because of the flux of time since the litigation commenced. The period intervening between 1937, when the Sales Tax Act was passed, and 1942, when the additional assessment here in controversy was made, is altogether too short a time to give the foregoing opinion or any other administrative opinion the force of law, and thus, as it were held that a taxing statute was enacted by acquiescence. The claim that an independent tax has been levied upon the merchants of this State, without *affirmative* action on the part of the legislature but merely by acquiescence, as a result of an opinion of the Attorney General, or for that matter as a result of practice, is utterly repugnant to all thoughts hitherto entertained on questions of taxation. Acquiescence is even sought to be made retroactive in so far as that occurring since the litigation herein was commenced is considered. Retroactive effect is ordinarily not given even to positive statutes enacted by the legislature. Moreover, the opinion of the former Attorney General has never, as we are informed, been published so we do

not know whether it has become generally known to the public or to the legislature, and the record before us is silent on the point. Nor is there any information in the record before us as to the administration of the law in other cases like that before us. In Crane Company vs. State Tax Commission (Ariz.) 163 Pac. 2d 656, the Court refused to pay any attention to a rule of the tax commission which was in force for a period of four years, exempting certain goods from the sales tax, and that in face of facts which might well have induced the court to do otherwise. In the case of Commissioner of Internal Revenue vs. Laird Wilcox and Maud Wilcox, the Supreme Court of the United States in an opinion of February 25, 1946 (not yet officially reported) set aside and held for naught a construction put upon the tax laws by the administrative department of the Government, though that construction had been adopted at least as early as 1936. Furthermore, we have held that consideration of contemporaneous construction by an official or a department " 'is restricted to cases in which the meaning of the statute is really doubtful, and the courts are not bound to follow, or justified in following, an executive construction which is clearly erroneous' ". Christensen, State Treasurer vs. Sikora, 57 Wyo. 57, 112 Pac. 2d 557. In that case we refused to follow a construction put upon a statute by a department of this State for a period of twenty-six years, and in a case in which the law, if as clear, was certainly not any clearer than the statute in the case at bar. That case cannot be waived aside by the bare statement, not supported by the facts, that the statute applicable in this case is doubtful. If that was good law then, it should be good law now, and that decision should not be considered merely as a "one way ticket".

The appellant had no opportunity to attack the construction put upon the law as above mentioned until the special assessment was made against it. It took the

first opportunity given it to do so. Matters of this kind are apt to take several years before they can be tested in the courts. So that to give any force to the interpretation put upon the law by the Attorney General or administrative officers is equivalent to depriving litigants in such matters of any and all redress in the courts of the State—surely an undesirable thing to convey to the knowledge of the tax payers of the State. The majority of the court, in my humble judgment, accordingly, has abdicated in this and like cases its prerogative and duty entrusted to it by the laws and the constitution of this State.

In view of the increasing burdens of taxation in this day and age it hardly behooves this court to usurp the functions of the legislature and aid in establishing a levy of tax which does not appear in the provisions of the law enacted by the legislature. The merchants of the State bear a heavy enough burden in acting as compulsory tax collectors for the State, and as guarantors, and if an independent tax, wholly and completely disassociated from the sales tax, which on the average is supposedly and ultimately to be borne by the consumer, is to be paid by them, then the levy of such independent tax, not infringing on any provision of our fundamental law, should be left to the legislature upon which devolves the function in that connection under the constitution.

ON PETITION FOR REHEARING
Petition Denied; May 14th, 1946

(169 Pac. 2d. 76)

In support of the petition there was a brief by Anthony F. Zarlengo of Denver, Colorado, and John C. Pickett of Cheyenne ,Wyoming.

## OPINION ON REHEARING

RINER, Justice.

Appellant has filed a petition for rehearing. It is asserted therein that in the prevailing opinion rendered in this case the rule announced in Christensen vs. Sikora, 57 Wyo. 57, 112 Pac. 2d 557, was disregarded. Counsel are in error. That was a case involving the Workmen's Compensation law of this state, where the

trial court, Judge Burgess sitting, had found upon ampel evidence that "the business of the employer was running a meat market and a grocery store and workshop where machinery was used" and that "the duties of the employee required him to wait upon trade in said grocery store, meat market and workshop". The law (§ 1, ch. 118, L. of Wyo. 1939; § 1 ch. 128, L. of Wyo. 1937), declared "workshops where machinery is· used" and "meat markets" to be "extra-hazardous occupations". It was urged that because the State Treasurer, the executive officer charged with the duty of administering the Workmen's Compensation law had always regarded grocery stores without more as not affected by that law the rule of contemporaneous construction placed upon a law by an official thus situated must prevail. We pointed out that "the courts are not bound to follow, or justified in following, an executive construction which is clearly erroneous". As the facts found in the Sikora case brought the employee squarely within the terms of the law defining extra-hazardous occupations the award made by the district court to the employee was affirmed. In brief, the general administrative rule announced by the Treasurer fell before the established facts in the case and the plain terms of the law.

In the instant case the prevailing opinion specifically said "if we were convinced that the construction of these administrative officers (the Attorneys General) acquiesced in by the Board as applied to the law before us was clearly wrong, we would be obliged to so say". We reached the conclusion, however, upon reasons which we regard as conclusive that neither the highest law officers of the state nor the Board were wrong and we ruled accordingly.

In the petition for a rehearing it is intimated that a provision of the Constitution of Wyoming might be

infringed by the Selective Sales Tax Act of 1937. It is a sufficient answer to this contention that neither before the Board, the district court nor this court, was such a question even hinted at as being involved. The pleadings of the appellant in the record before us, its assignments of error and its briefs here will be searched in vain for the slightest suggestion of such a point being in the case. We have repeatedly declared the rule to be that "points raised for the first time in a petition for rehearing will ordinarily not be considered". First National Bank of Green River vs. Ennis et al., 45 Wyo. 165, 15 Pac. 2d 1111, and cases cited. And 3 Am. Jur. 350, 351, § 806, says that:

"In civil cases it is a well-recognized rule that questions not advanced on the original hearing will not be considered on the petition for a rehearing. This must necessarily be so, because if new questions could be raised on a rehearing, there would be no end to a case on appeal or error. This rule is especially applicable in the case of a question as to the constitutionality of a statute."

See Cook vs. Marshall Co., .... Iowa ...., 95 N. W. 409; Mollohan vs. Patton, 110 Kan. 663, 205 Pac. 643; Poston vs. Ebert, 221 Mich. 361, 193 N. W. 201; State ex rel. and to Use of Missouri Pac. R. Co., vs. Public Service Commission of Missouri, .... Mo. ...., 297 S. W. 47; Pingree National Bank of Ogden vs. Weber Co., 54 Utah 599, 183 Pac. 334.

Counsel seem to feel aggrieved because the prevailing opinion pointed out the consequences which would ensue if the contention of appellant were upheld. They insist that the court should not have done this because it constitutes an "unjust reflection on the integrity of the company". If counsel see fit to draw such an inference it is hardly the fault of the court which must decide the causes submitted to it and supply the reasons for its action. Doubtless every litigant who claims money and

property as his own when a court enters a judgment against him might entertain the same feeling.

Petitioner insists that the Selective Sales Tax Act involved establishes a "consumers tax and nothing else". The legislature evidently thought otherwise, for that body said, as indicated in our original opinion, that the "*consumer* and user of any single purchase of twenty-four (24c) cents or less *shall not be required to pay the tax provided herein*" and that "*the tax of one per-cent* herein imposed" upon such purchases "shall be *assumed and paid for by the vendor* who shall keep a detailed segregated record of all such sales" (subsection (e) of section 4 of the Act aforesaid; italics supplied). Language clearer in meaning or more positive in its command could hardly be employed.

The remaining material in the petition for rehearing is merely a reiteration of the contentions of the appellant presented in its original brief and argument here. A majority of the court gave those contentions a most careful and thorough examination in the light of the facts and law involved. The result was adverse to appellant's claims. We have found nothing at all in this petition which convinces us that our reasoning was at fault or that we were mistaken in reaching that result. It necessarily follows that the petition for rehearing should be denied.

KIMBALL, J., concurs.

BLUME, C. J., dissents.